Cecile **BUONOCORE**, Individually and as Administratrix of the Estate of John Buonocore, III, deceased, and John Buonocore, Jr., Appellants,

v.

**TRANS WORLD AIRLINES, INC.**, Appellee.

No. 961, Docket 89–9101.

United States Court of Appeals, Second Circuit.

Argued March 6, 1990.

Decided March 27, 1990.

---

Michel F. Baumeister, New York City (Allan Young, Elizabeth A. Mark, and Baumeister & Samuels, New York City, on the brief), for appellants, Cecile Buonocore and John Buonocore, Jr.

John N. Romans, New York City (Janine L. Pollack and Curtis, Mallet–Prevost, Colt & Mosle, New York City, on the brief), for appellee, Trans World Airlines, Inc.

Before TIMBERS, MESKILL and ALTIMARI, Circuit Judges.

TIMBERS, Circuit Judge:

Appellants Cecile Buonocore and John Buonocore, Jr. appeal from a summary judgment in favor of TWA entered November 6, 1989 in the Southern District of New York, Robert P. Patterson, Jr., *District Judge*, dismissing the complaint. The court held that Article 17 of the Warsaw Convention, to which the United States is a signatory, did not render TWA liable for the death of John Buonocore, III ("Buonocore"), appellants' son.

The sole issue on appeal is whether the court erred in failing to construe Article 17 to impose liability on TWA under the circumstances leading to Buonocore's tragic death. For the reasons which follow, we affirm.

### I.

We summarize only those facts and prior proceedings believed necessary to an understanding of the issue raised on appeal.

Buonocore had a TWA ticket for a flight from Leonardo da Vinci Airport in Rome to JFK Airport in New York. The flight was scheduled to leave Rome at 11 A.M. on December 27, 1985. Apparently pursuant to TWA's instruction, Buonocore arrived at the airport at least two hours prior to the scheduled departure. He went to the check-in counter, presented his ticket and luggage, and received a boarding pass with seat assignment and a baggage claim.

Next, Buonocore walked some distance away from the counter toward a mobile snack cart. He was still in the public area of the airport, i.e., he had not gone through immigration control or security inspection. At approximately 9:10 A.M., the terminal was attacked by terrorists who hurled hand grenades and sprayed the crowd with machine gun fire. Buonocore was one of 16 killed in the attack.

Buonocore's parents commenced this wrongful death action against TWA, claiming as the sole basis of liability Article 17 of the Warsaw Convention of 1929.[1] The district court held that Article 17 did not render TWA liable and granted TWA's motion for summary judgment. This appeal followed.

### II.

Article 17 imposes liability on airlines for accidental injuries that occur "in the course of any of the operations of embarking or disembarking." Originally, plaintiffs who relied on this provision were required to show some degree of fault on the airline's part. In the Agreement Relating to Liability Limitations of the Hague Protocol and Warsaw Convention (known as the Montreal Agreement of 1966), CAB Agreement 18900, *reprinted in* 49 U.S.C. § 1502 note (1988), the airlines agreed among themselves to change from a fault-based system to strict liability and to permit awards of up to $75,000. This remains the ceiling.

We begin our analysis of Article 17 with the literal language of the provision. We would end there if that language were rea-

---

1. The treaty is officially titled the Convention for the Unification of Certain Rules Relating to International Transportation by Air. It was concluded at Warsaw, Poland, on October 12, 1929, and was adopted by the United States in 1934. 49 U.S.C. § 1502 note (1988).

sonably susceptible of only one interpretation. *Chan v. Korean Air Lines*, 109 S.Ct. 1676, 1683 (1989). The language of Article 17, however, is not so clear. Reasonable people may differ as to whether the focus should be on "embarkation", so that only the physical act of enplaning is covered. Alternatively, a focus on "any operations" can be broad enough to cover almost any transaction between a passenger and an airline relating to the passenger's eventual walk onto the airplane. Reference to the treaty's history therefore is appropriate. *Choctaw Nation v. United States*, 318 U.S. 423, 431 (1943).

Our task is made easier by an earlier decision of our Court in *Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2 Cir. 1975), *cert. denied*, 429 U.S. 890 (1976). In *Day*, after analyzing the history of Article 17 in the context of a terrorist attack at Hellenikon Airport in Athens, Greece, we held that the airline was liable for the resulting deaths and injuries. We found that the drafters of Article 17 rejected a proposed draft that would have rendered airlines liable for *all* accidents in terminals, *id.* at 35, and also rejected a suggestion that would have eliminated liability for *any* accident in a terminal. *Id.* We inferred from the discussions surrounding these proposals that the drafters intended a flexible approach which would adapt to the changing conditions of international air travel over the years.

█ We held that, consistent with a flexible approach, several factors should be assessed to determine whether a passenger was "in the course of any of the operations of embarking". The factors to be considered are: (1) the activity of the passengers at the time of the accident; (2) the restrictions, if any, on their movement; (3) the imminence of actual boarding; and (4) the physical proximity of the passengers to the gate. *Id.* at 33–34; *see also Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152, 155 (3 Cir.1977) (en banc) (applying *Day* test in case arising from the same terrorist attack).

The *Day* test has come under some criticism over the years on the ground that it construed Article 17 too broadly in favor of liability. *Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256, 1262 (9 Cir.) (Wallace, J., concurring), *cert. denied*, 431 U.S. 974 (1977); *Martinez Hernandez v. Air France*, 545 F.2d 279, 283–84 (1 Cir.1976), *cert. denied*, 430 U.S. 950 (1977); *Sweis v. Trans World Airlines, Inc.*, 681 F.Supp. 501, 504 (N.D.Ill.1988). Aside from our rule that one panel of our Court is not free to overrule the holding of a previous one, *e.g.*, *Kremer v. Chemical Constr. Corp.*, 623 F.2d 786, 788 (2 Cir. 1980.), *aff'd*, 456 U.S. 461 (1982), we hold that the *Day* analysis is still the correct one. A side-by-side comparison of the facts in *Day* with the facts in the instant case leads us to believe that a different outcome is warranted.

The first factor enunciated in *Day* is the activity of the passengers at the time of the accident. The *Day* passengers were actively engaged in preparations to board the plane. By contrast, Buonocore had only checked in at the ticket counter and was in the public area near a snack counter. The second factor is the restrictions on the passengers' movement. The *Day* passengers had been herded in line and risked missing the flight if they strayed. Buonocore had ample time to roam freely about the terminal before his flight was called. The third factor is the imminence of actual boarding. The *Day* passengers were within minutes of boarding. Buonocore's flight was to depart almost two hours later. The fourth factor is the proximity of passengers to the gate. The *Day* passengers were at the gate. Buonocore was nowhere near the gate.

Appellants here place great emphasis on the fact that the *Day* passengers, like Buonocore, had not yet gone through security inspection, although they acknowledge that, unlike Buonocore, the *Day* passengers had gone through passport and immigration control. The disparity in physical layout between the Rome and Athens airports explains why this similarity is relatively unimportant. At the time of the *Day* terrorist attack, passengers in Athens could not avail themselves of security in-

spection until immediately before they boarded the plane. They had no choice but to remain exposed to the risks associated with an area open to the public. By contrast, the Rome airport has the configuration more familiar to the contemporary traveler. That is, passengers may use the services (restaurants, newsstands, and the like) in the airport's public areas, and wait until the last minute to go through the security checkpoint (i.e., when the passengers walk through the metal detector and submit their carry-on bags for x-ray screening). Alternatively, if they choose to undergo security inspection earlier, they can find the same services in the "secured" or "sterile" area. Since passengers are free to exercise that option, it would not be consistent with Article 17 to hold airlines liable to those passengers who elect to remain in the area open to the general public. If we were to adopt appellants' claim, for practical purposes we would be imposing Article 17 liability on airlines for *all* accidents that occur in airport terminals. The drafters of Article 17 specifically rejected such liability. *Day, supra,* 528 F.2d at 35.

Appellants and TWA do not agree whether TWA instructed Buonocore to arrive at least two hours prior to departure. On appeal from summary judgment in favor of TWA, we assume all inferences favorable to appellants, including the assumption that the airline did so instruct Buonocore. Nevertheless, our analysis of *Day* above leads us to hold that this one factor in favor of Article 17 liability is insufficient by itself to tip the balance in favor of appellants.

We have applied the *Day* test once before. *Upton v. Iran Nat'l Airlines Corp.,* 450 F.Supp. 176 (S.D.N.Y.1978), *aff'd mem.,* 603 F.2d 215 (2 Cir.1979). In *Upton,* the passengers had checked in and were waiting for their delayed flight in the airport's public area when the roof collapsed, killing several. The case was similar to the instant one in all material respects other than the cause of the injuries. The district court, applying *Day,* ruled for the airline, due primarily to the fact that the passengers were in the airport's public

area and not under any immediate supervision by the airline. *Id.* at 178. We affirmed without opinion.

Appellants contend that the distinction between a terrorist attack and a roof collapse is significant for Article 17 liability. They fail to point to any basis for such distinction in the treaty's text or history. Instead they merely assert that terrorism is a more serious danger in modern air travel. While they may be correct, that strikes us as having no apparent relevance to the issue of the construction of a treaty.

We are aware, as was the district court, of the well-reasoned opinion in *Sweis v. Trans World Airlines, Inc.,* 681 F.Supp. 501 (N.D.Ill.1988), which involved an action for damages arising from the same terrorist attack as in the instant case. *Sweis* criticized the *Day* test, but applied it anyway. It held in favor of TWA on a motion for summary judgment. *Id.* at 505. We find the analysis in *Sweis,* while not binding, to be persuasive.

Appellants attempt to distinguish *Sweis* on the ground that Buonocore had received his boarding pass and baggage claim check, while the *Sweis* passengers were in line waiting for theirs. To the extent that this distinction is relevant, it cuts both ways. The *Sweis* passengers were at an earlier stage of the check-in process than was Buonocore, but they were under greater restriction of movement by TWA than was Buonocore.

We hold that the district court correctly entered summary judgment in favor of TWA.

### III.

To summarize:

We affirm the district court's grant of summary judgment in favor of TWA. To hold TWA liable for the tragedy that befell Buonocore and his family would require us to stretch Article 17 liability contrary to law. This we decline to do.

Affirmed.