Tova **RABINOWITZ** and Baruch **Rabinowitz,** Plaintiffs,

v.

**SCANDINAVIAN AIRLINES,**
Defendant.

No. 89 Civ. 8647 (WCC).

United States District Court,
S.D. New York.

July 3, 1990.

**442**

First & First, New York City (Mitchell First, of counsel), for plaintiffs.

Condon & Forsyth, New York City (Michael J. Holland, Deborah A. Elsasser, of counsel), for defendant.

## OPINION AND ORDER

CONNER, District Judge.

Defendant Scandinavian Airlines System ("SAS") moves this Court pursuant to Fed. R.Civ.P. 56 for summary judgment of plaintiffs' claim for liability under the Warsaw Convention on the ground that plaintiff Tova Rabinowitz was not "in the course of embarking or disembarking" within the meaning of Article 17 of the Warsaw Convention when she allegedly sustained the injuries for which she seeks damages in this action. Plaintiffs cross move for summary judgment on this claim. Defendant further moves for summary judgment of the state law claim of negligence on the ground that SAS did not own, operate, maintain or control the premises where plaintiff was allegedly injured. For the reasons stated hereinafter, defendant's motions are granted and plaintiffs' cross motion is denied.

### FACTS

On September 23 and 24, 1989 plaintiffs Tova Rabinowitz and Baruch Rabinowitz were passengers on SAS Flight 914 traveling from New York to Moscow, with a short layover in Copenhagen, Denmark. Plaintiffs' flight arrived at Copenhagen Kastrup Airport on September 24, 1989 at approximately 9:25 a.m. Copenhagen time. Plaintiffs' connecting SAS Flight 730 was scheduled to depart for Moscow at 11:20 a.m. Copenhagen time.

Plaintiffs claim that upon arrival at Copenhagen Kastrup Airport, they asked SAS employees to direct them toward the gate of their connecting SAS flight. Plaintiffs then proceeded, as allegedly directed, from gate 40 in Concourse C of the airport terminal building, at which they had arrived, to gate 26 in Concourse B, where their connecting flight was departing, by way of a moving sidewalk, on which Tova Rabinowitz ("plaintiff") claims her foot became caught at approximately 9:30 Copenhagen time. After she was attended to by Copenhagen airport personnel for approximately one-half hour, plaintiffs continued to gate 26 where they boarded SAS Flight 730 and departed for Moscow at 11:20 a.m.

### DISCUSSION

**I. The Standard for Summary Judgment**

██ A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact." Fed.R. Civ.P. 56(c); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). It must establish that there is a "genuine issue for trial." *Id.* at 587, 106 S.Ct. at 1356. "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight*, 804 F.2d at 11. The inquiry under a motion for summary judgment is thus the same as that under a motion for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

Defendant's motion for summary judgment on plaintiffs' Warsaw Convention claim is based on the contention that Tova Rabinowitz was not in the process of embarking or disembarking at the time of the incident and SAS is, therefore, not liable to plaintiffs under Article 17 of the Warsaw Convention.[1] Defendant further moves for summary judgment on plaintiffs' negligence claim on the ground that SAS did not own, operate, maintain or control the area where plaintiff was allegedly injured.

## II. Claim under the Warsaw Convention

The application of the Warsaw Convention to any damages claim is determined by Article 1 and the transportation contract which, in the transportation of passengers, is the passenger ticket. Article 1 includes within the scope of the Warsaw Convention's application "all international transportation of persons, baggage, or goods performed by aircraft for hire." 49 Stat. 3014. Article 1(2) of the Warsaw Convention defines "international transportation" as:

> any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention.

40 Stat. 3014.

Where transportation is "international" as defined in Article 1(2), the provisions of the Warsaw Convention apply and automatically govern the rights of the parties to an action for damages. *Benjamins v. British European Airways*, 572 F.2d 913 (2d Cir.1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979). Because plaintiffs' contract of transportation provided for travel that commenced and terminated in New York with stopping places in Copenhagen and Moscow,[2] the provisions of the Warsaw Convention apply to this action.

The basic provision of the Warsaw Convention dealing with the liability of an airline for personal injury of a passenger is Article 17, which provides:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

---

**1.** Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, TS No. 876 (1934), *reprinted in* 49 U.S.C. § 1502 (1976) ("Warsaw Convention").

**2.** Plaintiffs' tickets also included stopping places in Zurich, Switzerland and Tel Aviv, Israel.

49 Stat. 3018. Under the Montreal Agreement,[3] liability for injuries described by Article 17 of the Warsaw Convention became absolute and the maximum damages were increased to $75,000. The issue presently disputed by the parties is whether Tova Rabinowitz was in the process of "disembarking" when she sustained her injuries. This question of federal law, to be decided on the facts of the case, *Schmidkunz v. Scandinavian Airlines System*, 628 F.2d 1205 (9th Cir.1980); *Curran v. Aer Lingus*, 17 Avi.Cas. (CCH) ¶ 17,560 (S.D.N.Y.1982), is appropriately considered upon a motion for summary judgment. *Day v. Trans World Airlines, Inc.*, 393 F.Supp. 217, 220 (S.D.N.Y.), *aff'd*, 528 F.2d 31, 33 (2d Cir.1975), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976); *Upton v. Iran National Airlines Corp.*, 450 F.Supp. 176, 177 (S.D.N.Y.1978), *aff'd without opinion*, 603 F.2d 215 (2d Cir.1979).

This language of Article 17 has been oft discussed and the scope of the terms is fairly well defined. In *Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir.1975), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976), the Second Circuit Court adopted a tripartite test to determine when passengers are deemed to be in the course of "embarking" within the meaning of Article 17. The considerations under this multi-factored test include (1) the passenger's activity at the time of the injury, (2) the passenger's location at the time of the injury and (3) under whose direction and control the passenger was acting. *Id.* at 33. In the *Day* case, the passengers were held to have satisfied this test because they:

> had already surrendered their tickets, passed through passport control, and entered the area reserved exclusively for those about to depart on international flights. They were assembled at the departure gate, virtually ready to proceed to the aircraft. The passengers were not free agents roaming at will through the terminal. They were requested to stand in line at the direction of TWA's agents

for the purpose of undergoing a weapons search which was a prerequisite to boarding. Whether one looks to the passenger's activity (which was a condition to embarkation), to the imminence of boarding, or even to their position adjacent to the terminal gate, we are driven to the conclusion that the plaintiffs were 'in the course of embarking.'

*Day v. Trans World Airlines, Inc.*, 528 F.2d at 33–34.

The *Day* test has been consistently followed by courts considering whether passengers were injured in the course of embarking. *See e.g. Buonocore v. Trans World Airlines, Inc.*, 900 F.2d 8 (2d Cir. 1990); *Schmidkunz v. Scandinavian Airlines System*, 628 F.2d 1205 (9th Cir.1980); *Upton v. Iran National Airlines Corp.*, 450 F.Supp. 176 (S.D.N.Y.1978), *aff'd without opinion*, 603 F.2d 215 (2d Cir.1979); *Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152 (3d Cir.1977) (en banc); *Baker v. Lansdell Protective Agency, Inc.*, 590 F.Supp. 165 (S.D.N.Y.1984). While several courts have similarly applied the *Day* test to a determination of whether passengers were injured in the course of disembarking, *see Knoll v. Trans World Airlines, Inc.*, 610 F.Supp. 844 (D.C.Colo. 1985); *Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256 (9th Cir.), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977); *Martinez Hernandez v. Air France*, 545 F.2d 279 (1st Cir.1976), *cert. denied*, 430 U.S. 950, 97 S.Ct. 1592, 51 L.Ed.2d 800 (1977), other courts have interpreted "disembarking" primarily by reference to the location of the passenger at the time of injury. *See e.g., MacDonald v. Air Canada*, 439 F.2d 1402 (1st Cir.1971); *Felisima v. Trans World Airlines, Inc.*, 13 Av.Cas. (CCH) ¶ 17,145 (S.D.N.Y.1974).

Since *Day*, one district court within the Second Circuit considering a "disembarking" case applied the tripartite test without questioning its applicability, *see Ricotta v. Iberia Lineas Aereas de Espana* 482 F.Supp. 497 (E.D.N.Y.1979), *aff'd without opinion*, 633 F.2d 206 (2d Cir.1980), while a second, noting the uncertainty of

---

**3.** Agreement CAB 18900 (1966).

which test to apply, concluded that because plaintiff was not in the process of disembarking under either test, it was unnecessary to resolve the issue, *see Curran v. Aer Lingus*, 17 Av.Cas. (CCH) ¶ 17,560 (S.D.N.Y.1982).

In *Day*, the Second Circuit Court looked to the language of the Convention and its legislative history in determining that subjective consideration of the three factors best effectuates the drafters' intent to create a system of international air law flexible enough to keep pace with the evolutionary changes in civil air travel. *Day* at 33–38. Because this analysis applies with equal force to both prongs of the single provision "in the course of any operations of embarking or disembarking," this Court concludes that *Day* pertains equally to disembarking cases. That the disembarking situation differs from that of embarking is well accounted for in the tripartite test of *Day.*[4]

In *Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256 (9th Cir.), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977), a "disembarking" case, the plaintiff had deplaned from an Air France aircraft and was proceeding to the gate of another carrier to make a connecting flight when she slipped and fell in a passenger corridor leading to the main area of the terminal building. The Ninth Circuit Court, applying the *Day* test, held that the plaintiff was not injured in the course of disembarking because she was acting under her own direction and was no longer under the direction or control of Air France.

Similarly, in *Martinez Hernandez v. Air France*, 545 F.2d 279 (1st Cir.1976), *cert. denied*, 430 U.S. 950, 97 S.Ct. 1592, 51

L.Ed.2d 800 (1977), the First Circuit Court held that passengers injured in a terrorist attack in the baggage area of the terminal building at Lod International Airport, Tel Aviv, Israel, were not in the course of disembarking at the time of the attack. The court noted that the passengers had already emerged from the aircraft, descended the stairs from the plane to the ground, traveled approximately ⅓ to ½ mile from the aircraft to the terminal building, presented their passports to the Israeli authorities and then passed through passport control. The court stated that the control factor weighed heavily in favor of the carrier since the passengers were not segregated into a group at the direction of any airline employee but were merely milling about awaiting their baggage, thus constituting free agents within the meaning of the *Day* decision.

In *Knoll v. Trans World Airlines, Inc.*, 610 F.Supp. 844 (D.C.Colo.1985), the district court held that a passenger who had left the airplane, walked through the jetway and walked some distance from the gate and fell in the terminal while attempting to locate immigration, was not in the course of disembarking. The court noted that plaintiff was in a concourse of the airport, not under control of the airline agents and that the plaintiff's "remaining activities were not conditions imposed by the airlines for her disembarking." *Id.* at 847.

In *Curran v. Aer Lingus*, 17 Av.Cas. (CCH) ¶ 17,560 (S.D.N.Y.1982), the district court found that when plaintiff walked through the gate area and boarded an escalator, he was not restricted in any way by Aer Lingus. While plaintiff was not a free

---

**4.** This Court considers only whether plaintiffs were disembarking at the time of the incident. With two hours and possibly a great distance to go, not to mention boarding and the many attendant activities of embarking, plaintiffs clearly were not within the course of embarking. *See Buonocore v. Trans World Airlines, Inc.*, 900 F.2d 8 (2d Cir.1990) (Second Circuit Court held that plaintiff, having checked in and received his boarding pass but remaining in a public area nowhere near the departing gate, with two hours to freely roam the airport was not in the course of disembarking because he was in a

public area, not imminently boarding, and without airline supervision); *Schmidkunz v. Scandinavian Airlines System*, 628 F.2d 1205 (9th Cir. 1980) (Ninth Circuit Court held that plaintiff arriving at Kastrup Airport in Copenhagen from United States who fell on moving sidewalk in terminal while proceeding to connecting SAS departure light was not in the course of embarking because she was still within the common passenger area of the terminal, was not at the gate imminently preparing to board and at the time was not under the direction of SAS personnel).

agent roaming the airport at will, he was free to mix with international travelers who had not yet cleared customs and roam at will through any part of the terminal reserved for such travelers. As such, the court ruled that plaintiff was not in the course of disembarking when injured.[5]

Application of the three relevant factors set forth in *Day*—activity, location and control—compelled each of these courts to conclude that the passengers were not in the process of "disembarking" and therefore not covered by the provisions of the Warsaw Convention. In fact, under either the *Day* tripartite test or the strict location test, "[t]he courts have consistently refused to extend coverage of the Warsaw Convention to injuries incurred within the terminal, except in those cases in which plaintiffs were clearly under the direction of the airlines." *Knoll v. Trans World Airlines, Inc.*, 610 F.Supp. 844, 846 (D.C. Colo.1985). Construing the affidavits liberally in plaintiffs' favor, and applying the tripartite test which evaluates plaintiffs' location at the time of accident, activity of plaintiffs and control by the airline, I, too, am obliged to find that plaintiffs were not embarking or disembarking when the incident occurred.

The facts are not heavily disputed. Plaintiff was allegedly injured while standing on a moving sidewalk located between Concourse C and Concourse B. Plaintiffs, after emerging from their arriving aircraft, left the area of the arrival gate, and entered the public concourse area as they proceeded to the gate of their departing flight. Plaintiffs contend that because the accident happened only five minutes after arrival, and no more than 75–100 feet from the arriving gate, they were still within the area of disembarking. While plaintiffs in this case were closer to the gate than those in most of the cases cited by defendant, this factor is not determinative because plaintiffs had entered a public area, containing duty free shops, restaurants, rest-

rooms and general seating areas not restricted to SAS passengers.

Although plaintiffs were proceeding from the arrival gate in Concourse C to the departure gate in Concourse B, they were proceeding at their own pace and under their own control. They were not required to be at the departure gate until fifteen minutes before the scheduled departure time, or 11:05.

No SAS personnel led or accompanied any of the arriving passengers through the airport to their departing flight. While plaintiffs could not leave the terminal building, they could roam at will within the terminal for the almost two hour stopover time before their departing flight. They were free to go to a restroom, restaurant, bar or refreshment counter, to shop in the arcade, or to visit with other international passengers in the waiting lounges.

Plaintiffs unpersuasively attempt to distinguish their case on several grounds. First, plaintiffs allege that they were specifically told by SAS employees to take the moving sidewalk to their connecting flight, unlike the cases cited by defendant in which the airlines exercised no control over the passengers. The Court disagrees with plaintiffs' premise that employee-given directions in response to a passenger's inquiry require the conclusion that plaintiffs were in the course of disembarking. In *Knoll v. Trans World Airlines, Inc.*, 610 F.Supp. 844 (D.C.Colo.1985), a case in which the plaintiff similarly slipped on a moving sidewalk, the Court refused to infer liability based on the fact that TWA personnel had directed her toward immigration and aided her when she fell, stating that she was not under the control of the airline's agents at that point. The court noted that plaintiff's "remaining activities were not conditions imposed by the airline for disembarking." *Id.* at 847. Plaintiff had been headed toward immigration, a condition to entry apparently imposed by the host country, not a condition to disembarking imposed by the airline.

---

**5.** In *Curran*, Judge Leval looked to *Felisima v. Trans World Airlines, Inc.*, 13 Av.Cas. (CCH) ¶ 17,145 (S.D.N.Y.1974), in which Judge Ward, under similar circumstances, applied the strict location test. Nonetheless, Judge Leval concluded that the plaintiff had not satisfied that test or the more flexible tripartite test set forth in *Day*.

More closely on point, the court in *Curran v. Aer Lingus*, 41 Avi.Cas. (CCH) ¶ 17,560 (S.D.N.Y.1982), found that although Aer Lingus provided personnel to meet the flight and give assistance to the arriving passengers, and posted a sign at the base of the escalator directing passengers to ascend to reach customs, such personnel did not control or direct passengers' behavior. The court found that in "merely assist[ing] passengers off the plane and toward customs," Aer Lingus did not control plaintiff's movements.

Here, too, plaintiff's allegation that an SAS employee directed them toward the moving sidewalk does not rise to any level of control by SAS. Where the *Curran* court deemed there to be no airline control in formal, customary practices of directing and assisting passengers upon arrival, plaintiffs in this case were plainly not under SAS control. Plaintiffs asked someone whom they believed to be an SAS employee in which direction to head for connection with their departing flight and that employee pointed the way. Such a responsive instruction does not satisfy the control factor set forth in *Day*.

Second, plaintiffs assert that none of the cases cited by defendant involved passengers transferring between planes of the same carrier, predicating liability on the basis of a continuous trip from New York to Moscow. Plaintiffs claim that they had no interest in stopping in Copenhagen. While plaintiffs may have believed their journey to be a continuous trip, their tickets clearly show that they contracted with SAS to stop in Copenhagen en route to Moscow. To adopt plaintiffs' position of continuous liability from the time a passenger embarks on the first of a series of connecting flights on that same airline until she disembarks from the final flight would be to impose liability on the airline for any accident that may occur in airport terminals en route, in direct contravention of the explicit terms and purpose of Article 17. Plaintiffs' belief that their trip was continu-ous is simply irrelevant to the statutory interpretation of Article 17.

Third, plaintiffs claim that SAS's position that once plaintiffs exited safely from the aircraft in Copenhagen it is no longer responsible until they embark on their connecting flight is belied by the following statements made in SAS advertisements to the public:

> If you travel SAS to Europe in the 90's, you'll be our customer all of the way. Not just in the air. You get off the plane in Copenhagen, but the way we look at things you're still our responsibility.

Plaintiffs' Memorandum in Opposition, Exhibits E and F. Again, a passenger's state of mind as to responsibility or duty, even perhaps where based on defendant's representations, does not alter the analysis of the provisions of the Warsaw Convention. The Court therefore grants defendant's motion for summary judgment of plaintiffs' claim for liability under the Warsaw Convention.

### III. Negligence Claim

█  Because the Warsaw Convention claim has been dismissed, this Court no longer has pendent subject matter jurisdiction over plaintiffs' state law negligence claim. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Although the parties are diverse, plaintiffs' complaint, demanding relief in the amount of $35,000, fails to meet the minimum $50,000 amount in controversy required by 28 U.S.C. § 1332 (Supp.1990). Accordingly, plaintiffs' state law claim is dismissed without prejudice.[6]

### CONCLUSION

For the reasons discussed above, defendant's motion for summary judgment is granted as to the Warsaw Convention claim and the pendent state law claims are dismissed for lack of jurisdiction. Plaintiffs' cross motion for summary judgment

---

**6.** Because this Court lacks jurisdiction, the Court declines to rule on the merits of defen-dant's summary judgment motion with respect to the state law claims.

is denied. This action is accordingly dismissed.

SO ORDERED.