862 F.Supp. 243 (1994)
Ne'Mat W.O. (Wife of) Fakhri Musa ABU HAMDEH, Plaintiff,
v.
AMERICAN AIRLINES, INC., Defendant.
No. 4:93CV930 FRB.
United States District Court, E.D. Missouri, Eastern Division.
September 6, 1994.
*244 *245 Paul H. Schramm, Schramm and Pines, St. Louis, MO, for plaintiff.
Leo W. Nelsen, Jr., Holtkamp and Liese, St. Louis, MO, for defendant.

MEMORANDUM AND ORDER
BUCKLES, United States Magistrate Judge.
Presently pending before the Court are plaintiff's Motion for Partial Summary Judgment (filed August 18, 1993) and defendant's Cross-Motion for Summary Judgment (filed October 26, 1993). All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).
In this action, plaintiff, who was a passenger aboard an American Airlines flight, has brought suit against defendant American Airlines, Inc., under the Warsaw Convention of 1934 as amended by the Montreal Agreement of 1966. Plaintiff's claim arises from an injury she received at London's Heathrow Airport while ascending an escalator in an effort to meet her connecting American Airlines flight. Because the Warsaw Convention is a treaty of the United States, jurisdiction of this Court is invoked under 28 U.S.C. § 1331.
Plaintiff moves for summary judgment claiming that at the time of her injury, she was in the course of the operations of embarking upon an American Airlines international flight destined for the United States, and that under Article 17 of the Warsaw Convention, as amended by the Montreal Agreement, defendant American Airlines is strictly liable to plaintiff for her injuries. Defendant also moves for summary judgment claiming that plaintiff was not engaged in any of the operations of embarking, and that therefore defendant is not liable under Article 17.
Pursuant to Rule 56(c), Federal Rules of Civil Procedure, a court may grant summary judgment if the information before the court shows that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). The sole issue disputed by the parties here is whether plaintiff was in process of embarking when she sustained her injuries. If so, strict liability attaches to defendant American Airlines under Article 17 of the Warsaw Convention, as amended by the Montreal Agreement. "This question of federal law, to be decided on the facts of the case, is appropriately considered upon [ ] motion[s] for summary judgment." Rabinowitz v. Scandinavian Airlines, 741 F.Supp. 441, 444 (S.D.N.Y.1990) (citing Day v. Trans World Airlines, Inc., 393 F.Supp. 217, 220 (S.D.N.Y.), aff'd, 528 F.2d 31, 33 (2d Cir. 1975), cert. denied, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976); Upton v. Iran National Airlines Corp., 450 F.Supp. 176, 177 (S.D.N.Y.1978), aff'd without opinion, 603 F.2d 215 (2d Cir.1979)).
*246 The relevant facts of this case are not in dispute. On May 9, 1992, at approximately 9:00 a.m., plaintiff and her husband arrived at London's Heathrow Airport aboard a KLM flight from Amsterdam, Holland.[1] They were to board a connecting American Airlines flight to their final destination in Chicago, Illinois, in the United States. Upon arriving at Heathrow, plaintiff and her husband encountered an employee of American Airlines who displayed a sign summoning passengers who were to board the connecting American Airlines flight. Plaintiff and the other American Airlines passengers left the terminal with the employee and boarded a van which transported them to Terminal # 3 at Heathrow. (Pltf.'s Reply, Exhs. 1-3; Deft.'s Cross-Mot.Summ.Judg., Exh. 5.) American Airlines and plaintiff's connecting flight were located at Terminal # 3. (Deft.'s Suppl.Ans. to Interrogs., filed Aug. 2, 1993.) Upon arrival outside Terminal # 3, the American Airlines employee instructed the passengers to go in the door and up an escalator to an American Airlines ticket counter where they were to receive their boarding passes to the American Airlines flight. (Pltf.'s Part.Mot.Summ.Judg., Exh. 1 at 2; Deft.'s Cross-Mot.Summ.Judg., Exh. 5; Pltf.'s Ans. to Interrogs., filed Aug. 18, 1993.)
Plaintiff and her husband went into Terminal # 3 and boarded the escalator. Plaintiff fell on the escalator and sustained injuries to her right knee and ribs. When plaintiff reached the top of the escalator, plaintiff's husband called for assistance. An employee of Heathrow Airport arrived with a wheelchair and transported plaintiff to a separate room where plaintiff's knee was cleaned. (Pltf.'s Reply, Exh. 2 at 14-20.) All of this occurred at approximately 9:10 a.m. on May 9, 1992. (Deft.'s Cross-Mot.Summ.Judg., Exh. 6.) After plaintiff's knee was cleaned, plaintiff and her husband left the room and went back through the terminal to the American Airlines area. Other international travelers were in the terminal. Once reaching the American Airlines area, plaintiff, still in a wheelchair, was placed where the passengers were waiting to get through to the airlines. Plaintiff and her husband already had their boarding passes to the American flight. They presented their tickets and passports at the American Airlines counter and their boarding passes were taken. Plaintiff and her husband then boarded a vehicle which transported them to the gate from where their flight was to depart.[2] They boarded the American Airlines flight and continued to their destination in the United States. (Pltf.'s Reply, Exh. 3 at 16-19.) Plaintiff's flight departed the gate at approximately 10:25 a.m. (Deft.'s Cross-Mot.Summ.Judg., Exh. 2.)
The escalator upon which plaintiff fell was located in the Common User Area at Terminal # 3. Stairs and a nearby "lift"[3] to the main floor were also located in the terminal. (Deft.'s Cross-Mot.Summ.Judg., Exh. 6.) Forty-one (41) carriers, including American Airlines, their passengers and employees, had access to this area. (Deft.'s Suppl.Ans. to Interrogs., filed Aug. 2, 1993; Deft.'s Cross-Mot.Summ.Judg., Exh. 2.) In 1992, at the time of the accident, all carriers used the same transfer bus stop and transfer entrance for passengers arriving at different terminals with connecting flights departing from Terminal # 3. (Deft.'s Cross-Mot.Summ.Judg., Exh. 2, 6.) After entering Terminal # 3, passengers are required to pass through a security check conducted by Heathrow. After passing through the security check, passengers enter into an area of the terminal where duty-free shops, restrooms, rest areas, lounges and other services are located. (Deft.'s Cross-Mot.Summ.Judg., Exh. 2.)
American Airlines' transfer desk was located approximately 750 to 1,000 feet from where plaintiff fell. The gate from which plaintiff's flight was to depart was located approximately 2,500 feet away. (Deft.'s Cross-Mot.Summ.Judg., Exh. 2.) The transfer desk was not located at the top of the escalator, but could be seen from the top of the escalator. (Pltf.'s Reply, Exh. 3 at 26.) *247 All passengers transferring to an American Airlines flight at Terminal # 3 are required to begin the boarding check-in procedures at the transfer desk, including an additional security check conducted by American itself. Once completing its security check, American completes its check-in procedures and directs its passengers to an area reserved for passengers ready to board. (Deft.'s Cross-Mot. Summ.Judg., Exh. 2.)
When plaintiff fell, she had not yet gone through Heathrow's security check at Terminal # 3. Further, she had not yet reached the American Airlines transfer desk nor had she begun any check-in procedures. (Deft.'s Cross-Mot.Summ.Judg., Exh. 2.)
Article 17 of the Convention for the Unification of Certain Rules Relating to International Transportation by Air ("the Warsaw Convention") imposes liability upon a carrier for "any bodily injury suffered by a passenger, if the accident which caused the damage ... took place ... in the course of any of the operations of embarking or disembarking." Under the Montreal Agreement, liability for injuries described by Article 17 of the Warsaw Convention became absolute and maximum damages that can be imposed against an airline were set at $75.000.00. American Airlines is a signatory to the Montreal Agreement. (See Pltf.'s First Request for Admissions, filed May 19, 1993, and Deft.'s Responses thereto, filed June 21, 1993.)
When assessing an airline's liability under Article 17, the court should look to the total circumstances surrounding a passenger's injuries. Maugnie v. Compagnie Nationale Air France, 549 F.2d 1256, 1262 (9th Cir.), cert. denied, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). Three factors are primarily relevant when determining whether an accident occurred "in the course of any of the operations of embarking" an airplane: 1) the location of the accident; 2) the activity in which the injured person was engaged; and 3) the control by the defendant of such injured person at the location and during the activity taking place at the time of the accident. Evangelinos v. Trans World Airlines, Inc., 550 F.2d 152, 155 (3d Cir. 1977); Day v. Trans World Airlines, Inc., 528 F.2d 31, 33 (2d Cir.1975), cert. denied, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976). In addition to these factors, the court should also consider the imminence of the passenger's actual boarding of the defendant airline's flight. Buonocore v. Trans World Airlines, Inc., 900 F.2d 8, 10 (2d Cir.1990) (citing Day, 528 F.2d at 33-34; Evangelinos, 550 F.2d at 155). Applying these factors, the undersigned finds that plaintiff was not engaged in the course of operations of embarking an American Airlines flight when she sustained her injuries.
Plaintiff was located on an escalator in Terminal # 3 at Heathrow Airport when the accident occurred. The words "in the course of any of the operations of embarking" do not exclude events transpiring within a terminal building. Day, 528 F.2d at 33; Evangelinos, 550 F.2d at 157. However, when plaintiff fell, she was in the Common User Area of Terminal # 3 and not under any immediate supervision by American Airlines. Buonocore, 900 F.2d at 11. See also Schmidkunz v. Scandinavian Airlines Sys., 628 F.2d 1205, 1207 (9th Cir.1980) (plaintiff not engaged in operations of embarking when fell on walkway located in common passenger area); Kantonides v. KLM Royal Dutch Airlines, 802 F.Supp. 1203, 1210 (D.N.J.1992) (plaintiff not engaged in operations of embarking when standing on moving walkway in common area of terminal). Further, the accident here occurred 750 to 1,000 feet from defendant American Airlines' transfer desk and approximately 2,500 feet from the gate from which plaintiff's flight was to depart. Although the issue "is not where [the plaintiff's] feet were planted" when the accident occurred, Day, 528 F.2d at 33, various courts have specifically noted the proximity of the accident in relation to the departure gate. See Schmidkunz, 628 F.2d at 1207 (plaintiff not in the course of embarking when she fell approximately 500 yards1500 feetfrom departure gate); Kantonides, 802 F.Supp. at 1210 (plaintiff not in course of embarking when she was 200 to 500 feet from departure gate); Evangelinos, 550 F.2d at 156 (plaintiffs in course of embarking when standing in line at departure gate ready to proceed to aircraft); Day, 528 F.2d at 33 (plaintiffs in course of embarking when assembled at departure *248 gate ready to proceed to aircraft). Finally, it is significant to note that at the time plaintiff fell, she was not located in a secure area of Heathrow Airport as she had not yet passed through the required security check. Additionally, employees and passengers of forty (40) other airlines had access to the area where plaintiff fell. See Buonocore, 900 F.2d at 10 (plaintiff not in course of embarking when accident occurred in public area); Kantonides, 802 F.Supp. at 1211 (plaintiff not in course of embarking when intermixed with passengers from other flights on other airlines); Rabinowitz v. Scandinavian Airlines, 741 F.Supp. 441, 446 (S.D.N.Y.1990)[4] (plaintiffs not in the course of embarking when in public area containing duty free shops, restaurants, restrooms and general seating areas not restricted to defendant airline's passengers); Rolnick v. El Al Israel Airlines, Ltd., 551 F.Supp. 261, 264 (E.D.N.Y.1982) (plaintiffs not in the course of embarking when not in area reserved for defendant airline's passengers or even for passengers in general); Evangelinos, 550 F.2d at 156 (plaintiffs in course of embarking when no longer mingling in broad area with passengers of other airlines); Day, 528 F.2d at 33 (plaintiffs in course of embarking when in area reserved exclusively for those about to depart on international flights). Therefore, considering the location of plaintiff here in relation to the public areas of the airport, the proximity of the accident to the defendant airline's transfer desk and departure gate, and the lack of exclusivity of other airline passengers and members of the public, the undersigned finds that the location of the accident does not dictate a conclusion that plaintiff was engaged in the course of the operations of embarking upon defendant American Airlines' flight.
Location should not be considered alone, however, when determining if plaintiff was in the course of embarking upon defendant's flight. Evangelinos, 550 F.2d at 155. In addition to the location of the accident, the nature of the activity in which plaintiff was engaged must be examined "to determine if that activity can fairly be considered part of `the operations of embarking.'" Id.; see also Day, 528 F.2d at 33. Plaintiff claims that, at the time of her fall, her actions were "in furtherance of her effort at Heathrow to meet her connecting flight...." (Pltf.'s Memo. in Supp.Part.Mot.Summ.Judg. at 9.) Plaintiff appears to argue that ascending the escalator upon which she fell at Heathrow Airport's Terminal # 3 was an essential condition imposed by defendant American Airlines for plaintiff to board her flight. (Pltf.'s Reply at 13.)
Plaintiff, her husband and other American Airlines passengers received directions, volunteered by an American Airlines employee, to ascend the escalator in Terminal # 3 to an area of the terminal where the American Airlines transfer desk could be located. Following these directions as relayed to her by her husband,[5] plaintiff entered Terminal # 3 and boarded the escalator. It was after she boarded the escalator when she fell.
When examining whether a plaintiff's activities were in the course of embarking upon a defendant airline's flight, courts have looked to whether the activity was a prerequisite to boarding. See Evangelinos, 550 F.2d at 156; Day, 528 F.2d at 33. In Evangelinos, terrorists attacked passengers of a TWA international flight at Hellinkon Airport in Athens, Greece. At the time of the attack, plaintiffs were standing in line at the departure gate, ready to proceed to the aircraft. Evangelinos, 550 F.2d at 156. Plaintiffs had completed virtually all the activities required as a prerequisite to boarding when the terrorist attack occurred. Id. They needed only to undergo physical and handbag searches and then physically proceed to the aircraft. Id. at 153. In finding *249 that the plaintiffs were in the course of the operations of embarking, the court noted that plaintiffs "were performing a final act required as a prerequisite to boarding busses employed by TWA to take [plaintiffs] to the aircraft." Id. at 156 (emphasis added).
In Day, plaintiffs were injured as a result of the same terrorist attack described in Evangelinos. Day, 528 F.2d at 32; Evangelinos, 550 F.2d at 153 n. 4. In Day, the court noted that the attack occurred after plaintiffs had gone through several of the required boarding procedures for international flights at the airport. Day, 528 F.2d at 32 (emphasis added). At the time of the attack,
plaintiffs had already surrendered their tickets, passed through passport control, and entered the area reserved exclusively for those about to depart on international flights. They were assembled at the departure gate, virtually ready to proceed to the aircraft. The passengers were not free agents roaming at will through the terminal. They were required to stand in line at the direction of TWA's agents for the purpose of undergoing a weapons search which was a prerequisite to boarding.

Id. (emphasis added).
Considering these activities, the court concluded that plaintiffs were in the course of embarking. Id. at 33-34.
Here, plaintiff was required to undergo a number of activities to board defendant's international flight. In addition to a security check conducted by the airport itself, plaintiff was required to undergo a security check conducted by American Airlines. Plaintiff had done neither of these when the accident occurred. Further, plaintiff had not begun any of defendant's required check-in procedures at the time she fell. All required boarding check-in procedures began at defendant's transfer desk, which was located 750 to 1000 feet from where plaintiff fell. It was some period after plaintiff fell and was attended to when she engaged in the required check-in procedures, that is, presenting her passport and ticket, surrendering her boarding pass, and proceeding to an area reserved for departing passengers. Although it may be beneficial to board the escalator to reach defendant's transfer desk and thus begin the required procedures, the undersigned finds that boarding the escalator was not a prerequisite to boarding the airline. There is no evidence that American Airlines would have prohibited plaintiff from boarding its flight had plaintiff chose to ascend the stairs or elevator located in the terminal rather than the escalator. Therefore, the undersigned finds that plaintiff was not engaged in an activity within "the course of any of the operations of embarking" upon defendant's airline.
Plaintiff argues that at the time of her accident, she was under the "direct control" of defendant's personnel. (Pltf.'s Reply at 15.) Plaintiff claims that defendant's control began when plaintiff and her husband were met at the incoming KLM flight by the American Airlines employee; that defendant's control continued through the transportation provided by defendant to Terminal # 3; and continued through the employee's directions to get out of the van, go through the door and up the escalator. (Pltf.'s Reply at 15.) Plaintiff argues that she was "restricted in [her] movements by the instructions and actions of defendant's personnel right up to the moment of the fall." (Pltf.'s Reply at 15.)
Plaintiff cites Ricotta v. Iberia Lineas Aereas de Espana, 482 F.Supp. 497 (E.D.N.Y. 1979), as illustrative of defendant's control when transporting plaintiff by van to another terminal of the airport. Although the plaintiff in Ricotta claimed that she was injured while in the course of "disembarking," the court applied the tripartite test of Evangelinos and Day and found that plaintiff was within the control of defendant's personnel when she fell from a bus which was transporting defendant airline's passengers from the airplane to the terminal. Id. at 498, 500. Applying Ricotta to the facts in the instant case, it is clear that plaintiff was under defendant's control when she was transported to Terminal # 3 in defendant's van. However, unlike Ricotta, plaintiff was not injured while in the van or during the course of transportation. Instead, plaintiff's injury occurred *250 after she exited defendant's van and entered Terminal # 3.
Plaintiff claims, however, that because she boarded the escalator pursuant to the instructions of defendant's employee, she remained under defendant's control at the time of her fall. The giving of instructions by a defendant airline's employee is a factor courts have considered when determining if a passenger was under the airline's control. See Evangelinos, 550 F.2d at 156 (plaintiffs under defendant's control when, acting pursuant to instructions, they were congregated in a specific area); Day, 528 F.2d at 33 (plaintiffs under defendant's control when required to stand in line at direction of defendant's agents); Kantonides, 802 F.Supp. at 1210-11 (plaintiff not under control of defendant on moving walkway when no evidence suggested that defendant's personnel instructed passengers to use walkway); Rolnick, 551 F.Supp. at 264 (plaintiffs not under control of defendant when "not acting at the behest of airline officials"). However, instructions given may be merely to assist passengers and not to control their movements. See Rabinowitz, 741 F.Supp. at 447. Although the instructions given here were not in response to a passenger's request for directions, the undersigned finds that defendant's employees were merely assisting the passengers and not controlling their movements. Further, the courts in Evangelinos and Day found that plaintiffs were under defendant's control when acting pursuant to instructions directly related to the boarding of defendant's flight. Evangelinos, 550 F.2d at 156 (by "directing the passengers ..., TWA had assumed control over the group ... directly and solely related to embarkation ..."); Day, 528 F.2d at 33 (plaintiffs were acting "at the direction of TWA's agents for the purpose of undergoing a weapons search which was a prerequisite to boarding"). Because plaintiff was not engaged in an activity which was a prerequisite to boarding defendant American Airlines' flight, the undersigned finds that plaintiff was not under the control of defendant when its employee instructed plaintiff to ascend to the main floor of the terminal by way of the escalator.[6] Further, if the undersigned were to construe the employee's instructions to have placed plaintiff under defendant's control, "this one factor in favor of liability is insufficient by itself to tip the balance in favor of [plaintiff]." Buonocore, 900 F.2d at 11.
Finally, plaintiff's accident occurred at approximately 9:10 a.m. Plaintiff's flight did not depart from the gate until approximately 10:25 a.m. Although there is no evidence before the Court establishing the actual time when plaintiff boarded the flight, the undersigned finds that there was no "imminence of actual boarding" at the time of plaintiff's fall. Buonocore, 900 F.2d at 10; Kantonides, 802 F.Supp. at 1210-11. In Buonocore, plaintiff was injured approximately two hours before his flight was to depart. Buonocore, 900 F.2d at 10. The court found that, unlike the plaintiffs in Day where plaintiffs were found to be in the course of embarking, Buonocore was not "within minutes of boarding." Id. Similarly, in Kantonides, the court found that plaintiff lacked the immediacy of boarding when she was injured approximately one-half hour before her flight was to depart. Kantonides, 802 F.Supp. at 1210-11. After considering the location of the accident and the activity in which plaintiff was engaged at the time of her fall, the fact that plaintiff was not within minutes of boarding, and that plaintiff fell approximately one hour and fifteen minutes before her flight departed, the undersigned finds no imminence of actual boarding at the time of plaintiff's accident.
After examining the total circumstances surrounding plaintiff's injuries, the undersigned *251 finds that the accident which caused plaintiff's injuries did not take place in the course of any of the operations of embarking upon defendant's flight. Therefore, defendant American Airlines is not liable under Article 17 of the Warsaw Convention for plaintiff's injuries and summary judgment should be granted in its favor.
Therefore,
IT IS HEREBY ORDERED that plaintiff's Motion for Partial Summary Judgment (filed August 18, 1993/Docket No. 16) is denied.
IT IS FURTHER ORDERED that defendant's Cross-Motion for Summary Judgment (filed October 26, 1993/Docket No. 26) is granted.
NOTES
[1] Plaintiff's travel originated in Amman, Jordan.
[2] The vehicle was used because of plaintiff's injury.
[3] The British use the term "lift" when referring to an elevator. The American Heritage Desk Dictionary 561 (1981).
[4] Although Rabinowitz involved a claim that plaintiffs were in the course of "disembarking" and on their way to a connecting flight, the court found by weighing the facts in light of the tripartite test that plaintiffs "were not embarking or disembarking when the [accident] occurred." Rabinowitz, 741 F.Supp. at 446.
[5] The employee's directions were given in English. Plaintiff is unable to read, speak or understand the English language. Therefore, the directions given by the American Airlines employee were relayed to plaintiff through her husband, who understands the English language. (Pltf.'s Reply, Exh. 1 at 1; Exh. 2 at 13.)
[6] The undersigned believes that the circumstances here may fall within the situation contemplated by the Evangelinos court where a defendant airline's strict control of passengers at the time of checking baggage at the entrance of the terminal may be relinquished and then reassumed after the passengers' entry into the line formed for going through the departure gate. Evangelinos, 550 F.2d at 155 n. 8a. Here, defendant American Airlines clearly controlled plaintiff's movements while transporting her to Terminal # 3. Applying the reasoning of Evangelinos, however, defendant's control may have been relinquished once plaintiff exited the transfer van and then reassumed when plaintiff began defendant's check-in procedures.