201 N.J. Super. 601 (1985)
493 A.2d 641
JOHN P. SWIDRYK, M.D., PLAINTIFF,
v.
SAINT MICHAEL'S MEDICAL CENTER, WILLIAM J. CORNETTA, JR., LEON SMITH, M.D., JAMES FLANAGAN, M.D., JOSEPH M. BYRNE, INDIVIDUALLY AND TRADING AS JOSEPH M. BYRNE COMPANY AND/OR FRED S. DAVIS COMPANY AND MARYLAND CASUALTY COMPANY, DEFENDANTS.
Superior Court of New Jersey, Law Division Essex County.
Decided March 15, 1985.
*602 James M. Ronan, Jr. for plaintiff (Giordano, Halleran & Ciesla, attorneys).
James P. Richardson for defendant Smith (Seller, Richardson & Stuart, attorneys).
NEWMAN, J.S.C.
This summary judgment motion raises the novel issue of whether a physician may maintain a cause of action for educational malpractice against a director of medical education for an incident alleged to have occurred during the physician's residency at the medical center.
The underlying claim of malpractice is attributed to negligence in the delivery of a child in July 1973. At that time plaintiff, Dr. John P. Swidryk, had just begun his first year of residency in obstetrics and gynecology at St. Michael's and was in the third week of the program. Dr. Swidryk has been named as a defendant in a malpractice suit for his alleged participation *603 in the delivery of a child later determined to have severe brain damage.
Dr. Swydryk has brought this declaratory judgment suit against, among others, Dr. Leon Smith, the Director of Medical Education at St. Michael's. It is alleged that Dr. Smith was negligent in failing to supervise adequately the intern and resident program and as a proximate result of Dr. Smith's negligence, Dr. Swidryk has been sued for malpractice. Further, Dr. Swidryk claims Dr. Smith breached a contractual duty to him by failing to provide a suitable environment for a medical educational experience in that Dr. Smith failed to supervise adequately the intern and resident program.
Dr. Smith has moved for summary judgment on a number of grounds; however, this motion will only address the argument that the amended complaint fails to state a cognizable tort or breach of contract. It is mere characterization to label this cause of action a breach of contract. The dominant trend in pleading is to dispose of the technical distinctions between similar causes of action and to achieve substantial justice. M v. F, 95 N.J.Super, 165, 170 (Cty.Ct. 1967); see Jersey City v. Hague, 18 N.J. 584 (1955). The public policy considerations which bar the tort claim also act to bar the contract claim. Hunter v. Board of Education of Montgomery County, 292 Md. 481, 439 A.2d 582, 586 n. 5 (1982); Smith v. Alameda Cty. Soc. Serv. Agency, 90 Cal. App.3d 929, 943, 153 Cal. Rptr. 712, 719 (1979). For the reasons previously stated at oral argument and elaborated on in this opinion, the court concludes that there is no cause of action for educational malpractice either on a tort or contract theory.
The foundation of Dr. Swidryk's claim is that Dr. Smith's conduct was negligent in that his actions as director of medical education fell below the standard of care essential to protect others from an unreasonable risk of harm. The vast majority *604 of courts to consider this issue have refused to recognize a cause of action for educational malpractice.[1]
The first reported case to consider the issue of educational malpractice was Peter W. v. San Francisco Unified School District, 60 Cal. App.3d 814, 131 Cal. Rptr. 854 (1976). There, plaintiff was an 18-year old who graduated from high school without basic academic skills such as reading and writing. The court held that although the school board had a duty to provide a proper education to plaintiff within the common usage of the term "duty," the board did not have a legal duty upon which a claim of negligence could be based. Id., 131 Cal. Rptr. at 859. The court refused to find the existence of a legal duty for several reasons. For one, the conflicting theories of the science of pedagogy prevented the construction of a workable rule of care. In other words, different but acceptable scientific methods of academic training made it unfeasible to formulate a standard by which to judge the conduct of those delivering the services. Second, the nature of the claim prevents a finding of legal causation. For example, failure in schools could stem from a variety of factors including the student's physical, neurological, emotional, cultural and environmental background, as well as the actual system itself. Lastly, school systems are already beset by social and financial problems for which no solution is yet available. To expose the schools to *605 liability in light of the above policy considerations would be an undue burden on society. Id., 131 Cal. Rptr. at 160-161.
In Donohue v. Copiague Union Free School District, 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1979) the Court of Appeals of New York considered the issue of whether to recognize a claim for educational malpractice. The court found that although the cause of action may fall within the traditional theories of tort law, as a matter of public policy, claims for educational malpractice should not be entertained. The court put it in the following terms:
To entertain a cause of action for "educational malpractice" would require the courts not merely to make judgments as to the validity of broad educational policies  a course we have unalteringly eschewed in the past  but, more importantly to sit in review of the day-to-day implementations of those policies. Recognition in the courts of this cause of action would constitute blatant interference with the responsibility for the administration of the public school system.... [Id. 391 N.E.2d at 1354.]
The issue of whether to create a tort for educational malpractice has arisen in a limited number of factual contexts. The plaintiff has been either a high school student who had not acquired basic academic skills, Peter W. supra, Donohue, supra, or a grade school student who was improperly placed in a special education program. See, e.g., Hoffman v. Board of Education of City of N.Y., 49 N.Y.2d 121, 424 N.Y.S.2d 326, 400 N.E.2d 317 (1979); DSW v. Fairbanks No. Star Bor. Sch. Dist., 628 P.2d 554. (Alaska 1981). These cases have arisen in the context of public education. The same rationale for precluding a cause of action for educational malpractice has also been found to apply when the defendant is a private school. Helm v. Professional Childrens' School, 103 Misc.2d 1053, 431 N.Y.S.2d 246 (Sup. 1980).
Here, the issue of whether or not to establish a cause of action for educational malpractice arises in a different context from those already mentioned. Dr. Swidryk is a physician, not a high school student or a grade school student with a learning disability. He was not required by law to attend medical school. St. Michael's is not a school board, but a graduate *606 medical residence program. However, the same public policy considerations control the issue of whether to recognize the tort of educational malpractice in New Jersey in the factual context presented.[2]
In order to find a defendant liable for negligence a legal duty must be found to exist and there must have been a breach of that duty. Fortugno Realty Co. v. Schiavone-Bonomo Corp., 39 N.J. 382, 393 (1963), McIntosh v. Milano, 168 N.J. Super. 466 (Law Div. 1979). Whether or not a duty exists is ultimately a question of fairness and the inquiry involves a consideration of the relationship of the parties, the nature of the risk and the public interest in the proposed solution. Essex v. New Jersey Bell Telephone Company, 166 N.J. Super. 124 (App.Div. 1979). Public policy considerations must play a major role in the determination of whether a legal duty exists. See Wytupeck v. Camden, 25 N.J. 450, 462 (1957).
As a general rule courts will not interfere with purely academic decisions of a university. See, e.g., Maas v. Corporation of Gonzaga University, 27 Wash. App. 397, 618 P.2d 106, 109 (1980). The New Jersey courts should not be required to sit in day to day review of the academic decisions of a graduate medical education program. This function is best left to the state board of medical examiners, the board of higher education and the Advisory Graduate Medical Education Council of New Jersey.
New Jersey has enacted many regulations and statutes to insure that proper medical education is provided within the *607 State. N.J.S.A. 18A:68-12 empowers the state board of medical examiners to issue licenses to schools or colleges which seek to qualify students to practice medicine. The school must provide a detailed explanation of its program of medical studies before the board of medical examiners will issue a license. N.J.S.A. 18A:68-13. The state board of medical examiners further requires that all who wish to practice medicine in New Jersey obtain a license to do so. N.J.S.A. 45:9-6. The license is generally granted only after successful completion of an examination. In order for an individual to qualify to take the examination he must establish he has satisfactorily completed high school, college, medical school and a one year internship program. N.J.S.A. 45:9-6 through -8.1.
New Jersey's regulation of medical education does not end after the issuance of a license. N.J.S.A. 18A:64H-2 establishes the Advisory Graduate Medical Education Council of New Jersey. The council makes recommendations for the development and implementation of graduate medical education programs. N.J.S.A. 18A:64H-2. The board of higher education, along with the advice of the council and concurrence of the commissioner of health set the standards which graduate medical education programs must meet in order to participate in a program which provides state and federal funding of graduate medical programs. N.J.S.A. 18A:64H-1,:64H-5b. The specific requirements for participation in the program are detailed in the New Jersey Administrative Code, N.J.A.C. 9:15 et seq. The council also has the power to review the qualifications of the director of medical education of each program to insure he is of the highest quality. N.J.S.A. 18A:64H-6(c).
The Legislature has vested the board of medical examiners, the board of higher education and the advisory graduate medical education council with the authority to insure that a proper medical education is delivered within New Jersey. It would be against public policy for the court to usurp these functions and inquire into the day to day operation of a graduate medical education program. From the standpoint of court administration, *608 it is also unwise to recognize a claim for educational malpractice where an individual physician is attempting to defend against a malpractice claim. To allow a physician to file suit for educational malpractice against his school and residence program each time he is sued for malpractice would call for a malpractice trial within a malpractice case. Creation of the tort of educational malpractice in this context would substantially increase the amount of time which a medical malpractice case takes to try now as well as have the potential to confuse the jury in its consideration of the underlying issues. The litigation explosion has limits and this is one area in which those limits should be definitely marked. Therefore, for reasons of public policy, there is no legal duty which will support a tort for educational malpractice in this class of case.
For the foregoing reasons and those expressed at the time the motion was initially heard, Dr. Smith's motion for summary judgment to dismiss Dr. Swidryk's complaint against him is granted.
NOTES
[1] Only Montana has recognized the tort of educational malpractice. B.M. v. State, ___ Mont. ___, 649 P.2d 425 (1982). All other courts to consider the issue have refused to recognize the tort. See Peter W. v. San Francisco Unified School District, 60 Cal. App.3d 814, 131 Cal. Rptr. 854 (1976); Donohue v. Copiague Union Free School District, 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352; Hoffman v. Board of Education of City of New York, 49 N.Y.2d 121, 424 N.Y.S.2d 376, 400 N.E.2d 317 (1979); Smith v. Alameda Soc. Serv. Agency, 90 Cal. App.3d 929, 153 Cal. Rptr. 712 (1979) Helm v. Professional Children's School, 103 Misc.2d 1053, 431 N.Y.S.2d 246 (Sup. 1980); DSW v. Fairbanks No. Star Bor. Sch. Dist., 628 P.2d 554 (Alaska 1981); Tubell v. Dade County Public Schools, 419 So.2d 388, 389 (Fla. Dist. Ct. App. 1982); Hunter v. Board of Education of Montgomery County, 292 Md. 481, 439 A.2d 582 (1982); John Doe v. Board of Education of Montgomery County, 295 Md. 67, 453 A.2d 814 (1982).
[2] The case at bar only addresses the question of whether a claim for educational malpractice may be maintained by a physician against his residence program. It does not consider the issue of the creation of a cause of action for educational malpractice in the factual situation presented in Peter W. and Hoffman, where a high school student sought damages because he had not acquired basic academic skills after a compulsory education, or a grade school student sought to recover damages because he was improperly placed in a special education program.