**Theodora KANTONIDES and Andreas Kantonides, Plaintiffs,**

v.

**KLM ROYAL DUTCH AIRLINES, Defendant.**

Civ. A. No. 91–3145 (AJL).

United States District Court,
D. New Jersey.

Sept. 10, 1992.

**1204**

Robert C. Carroll, Forman, Forman, Cardonsky, Andril & Ungvary, Elizabeth, N.J., for plaintiffs.

H. John Schank II, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, N.J., John F. Schutty III, Condon & Forsyth, New York City, for defendant.

## OPINION

LECHNER, District Judge.

This is an action by plaintiffs Theodora Kantonides ("T. Kantonides") and her husband Andreas Kantonides ("A. Kantonides") (collectively, the "Kantonides") against defendant KLM Royal Dutch Airlines ("KLM"). Jurisdiction appears to be appropriate pursuant to 28 U.S.C. § 1332.

Currently before the court is the motion of KLM for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the complaint (the "Complaint"), filed 19 July 1991.[1] For the reasons set forth below, summary judgment is granted.

*Facts*

For the purposes of this motion, KLM does not contest the Kantonides' recitation of the facts surrounding the accident. KLM 12G, ¶ 3. T. Kantonides and A. Kantonides are husband and wife and are residents of New Jersey. Kantonides Dep. at 5–6. T. Kantonides is fifty-nine years old. *Id.* at 5. KLM is a foreign corporation with its principal place of business in Amsterdam, the Netherlands. Answer, ¶ 1. The Kantonides purchased round trip tickets for travel on KLM to Larnaca, Cyprus. Complaint, ¶ 2–3. KLM provided the Kantonides with round trip air transportation between New York and Cyprus. *Id.*, ¶ 5.

On the morning of 24 July 1989, the Kantonides departed from J.F. Kennedy Airport in New York on KLM flight 644 to Amsterdam. Kantonides Dep. at 16. The Kantonides' ultimate destination was Cyprus; however, the flight plan required a stop at the Schiphol Airport in Amsterdam to change aircraft before continuing on to Cyprus. KLM 12G, ¶¶ 7–9. On 25 July 1989 at approximately 10:30 a.m. local time, KLM flight 644 arrived at Schiphol Airport. KLM 12G, ¶ 7; Dekker Aff. at 2. Before the passengers departed the aircraft, an announcement was made on board directing passengers with connecting flights to the appropriate gates. Kantonides Dep. at 21. The Kantonides were to meet connecting KLM flight 537; the announcement

---

**1.** In support of this motion, KLM submitted: Memorandum of Law in Support of KLM's Motion for Summary Judgment (the "Moving Brief"); Reply Memorandum of Law in Support of KLM's Motion for Summary Judgment (the "Reply Brief"); Statement of Material Facts as to Which No Genuine Issue Exists (the "KLM 12G"), including as Exhibit B, Answer on Behalf of KLM Royal Dutch Airlines (the "Answer"), including as Exhibit C, Plaintiff's Certified An-

swers to KLM Royal Dutch Airlines' First Set of Interrogatories (the "Kantonides Answers to KLM Interrogatories"), including as Exhibit D, Deposition upon Oral Examination of Theodora Kantonides (the "Kantonides Dep."); Affidavit of A.J.M. Dekker (the "Dekker Aff.").

In opposition to this motion, the Kantonides submitted: Plaintiffs' Brief Opposing Defendant's Motion for Summary Judgment (the "Opp. Brief").

stated flight 537 would depart from Gate C41. *Id.* at 24; Dekker Aff., ¶¶ 3–4. Gate C41 is approximately one hundred and fifty meters from gate D49, the gate at which the Kantonides arrived. KLM 12G, ¶ 10; Opp. Brief at 2. The Kantonides were scheduled to depart for Cyprus at 11:35 a.m. local time on KLM flight 537 which provided them with approximately one hour to meet their connecting flight. KLM 12G, ¶ 9.

To move between gates it is necessary for passengers to walk through the corridors of the terminal building. KLM 12G, ¶ 10. Passengers are free to walk throughout this area of the terminal building; movement is not restricted. *Id.*

KLM flight 644 discharged its passengers upon arrival. KLM 12G, ¶ 7. The Kantonides left the aircraft and began to walk through Schiphol Airport toward Gate C41. *Id.*, ¶ 8; Kantonides Dep. at 25. T. Kantonides stated:

> When KLM flight 644 landed ..., my husband and I walked from the airplane to the passenger terminal.... We took a straight path to the KLM gate which was between 250 to 500 feet away via the moving walkway. My husband and I were near the end of the moving walkway when suddenly and without warning the moving walkway malfunctioned, causing us and the other passengers on the moving walkway to fall.

Kantonides Answers to KLM Interrogatories, Responses 4, 9. T. Kantonides stated that she fell one-half hour after leaving the airplane from New York. Kantonides Dep. at 28–29.

Despite the Kantonides' statements that they "have knowledge of the manner in which the subject accident occurred," Kantonides Answers to KLM Interrogatories, Response 3, T. Kantonides does not recall how she fell or what caused her to fall. KLM 12G, ¶ 4; Kantonides Dep. at 30–37.[2] Although A. Kantonides witnessed his wife's fall, he has not submitted any testimony regarding his observations of the accident.[3]

With regard to the accident, T. Kantonides explained that after she fell she started screaming and her husband helped her to get up. Kantonides Dep. at 37. Shortly thereafter a KLM employee arrived and helped her into a wheelchair. *Id.* The KLM employee took her, by wheelchair, to a medical office or emergency room in the airport. *Id.* at 38–39. T. Kantonides stated that the airport doctor examined her arm and back and indicated that nothing was broken. He gave her a couple of pills for pain and put her arm in a sling. *Id.* at 39. After an examination by the airport doctor, T. Kantonides was taken by wheelchair to board flight 537 to Cyprus. Kantonides Dep. at 39.

T. Kantonides stated that, as a result of the accident, she suffered several fractured ribs, a fracture of the radial head of her right elbow and a lumbar sprain. Kantonides Answers to KLM Interrogatories, Response 12(a)–(b). She contends these injuries have caused her pain and restriction of motion of the affected areas. *Id.* She stated that her condition has improved

---

**2.** T. Kantonides stated in deposition:
Q: What did you do after you left the aircraft?
A: I said, I started walking to the other plane.
Q: Do you recall whether you saw, as you were walking, any shops, newsstands?
A: No, no, no.
　　　　* * *
Q: Yes, I want you to tell me what you did, what you saw when you got off the aircraft. I just want to make a clear record. You can't recall what you saw?
A: I don't really understand what you mean. I don't understand, really.
Q: What did you fall on, how did you fall?
A: How?
Q: Describe to me how you fell. What happened to make you fall?
A: I said, I was walking and I fell.
Q: Was there anything that caused you to fall?
A: I don't know.
Q: You don't know what caused you to fall?
A: I just fell down. You plan to fell down? Kantonides Dep. at 29–31.

**3.** In the Kantonides Interrogatories, the Kantonides described several witnesses to the accident: a KLM stewardess, two airport security officers and two passengers from the New York–Cyprus flight. The names and addresses of the people are unknown and the Kantonides make no representation that there have been attempts to identify or locate the witnesses. Kantonides Answers to KLM Interrogatories, Responses 3, 6, 8, 10.

somewhat over the last two years, but that during "bad weather, she still experiences pain and restriction of motion in her right arm and back. In addition, when doing housework and while helping her husband at the restaurant, she often experiences pain and restriction of motion to the affected areas." Kantonides Answers to KLM Interrogatories, Response 13.[4]

The accident occurred in the common area of the terminal building which is owned, maintained and controlled by the Schiphol Airport Authority (the "Airport Authority"). KLM 12G, ¶ 5; Dekker Aff., ¶ 5. The moving sidewalks are owned, maintained and controlled by the Airport Authority. KLM 12G, ¶ 5; Dekker Aff., ¶ 7. KLM leases portions of Schiphol Airport from the Airport Authority; however, these areas do not include the location of the accident. Id., ¶ 6.

KLM maintains that it "was not aware of any irregularities with respect to the moving sidewalk where the accident allegedly occurred." KLM 12G, ¶ 6; Dekker Aff., ¶ 7.

The Kantonides maintain that even though the accident occurred in the common area, it was during the course of disembarking and embarking on KLM flight 644 and 537, respectively. Kantonides Answers to KLM Interrogatories, Response 10. However, A.J.M. Dekker ("Dekker"), the Head of KLM Commercial Affairs, Facilities Services, Real Estate Department, stated:

> I can state based upon my experience and knowledge of KLM's procedures at Schiphol Airport, that ... [T.] Kantonides was no longer in the control of KLM and that she had not yet begun the embarkation process for KLM flight no. 537 at Gate C41 (she had not yet presented herself at the gate, had not yet surrendered her boarding pass and had not yet lined up in the departure area with other passengers to board the aircraft).

Dekker Aff., ¶ 8.

A letter to KLM from R.R. Roos, legal counsel to the Airport Authority, related

the substance of an inquiry into the Kantonides accident. Opp. Brief, Ex. C. The Airport Authority inquired into the accident with the airport police and terminal service staff. Id. The Airport Authority confirmed that T. Kantonides was treated by airport medical services for a painful right arm. Id. However, the inquiry yielded neither information about the accident, nor reports about any malfunction of the moving walkways on the day of the accident or the days directly before or after the accident. Id. The letter from the Airport Authority stated that all the moving walkways are systematically checked every six weeks by the airport maintenance. Id. In addition, the moving walkways are inspected annually by the government. Id.

The letter from the Airport Authority hypothesized that because there is no evidence of any defect to the moving walkway, someone "must" have pressed the emergency stop button. Opp. Brief, Ex. C. The letter stated: "[T]hese facilities are on government's instructions equipped with a stop button and provided on two sides with handrails so as to enable users to hold onto, which of course is of particular importance in case of an emergency stop. The use of escalators and [moving walkways] requires in that sense some care on the part of the users." Opp. Brief, Ex. C.

T. Kantonides seeks damages in compensation for "her pain and suffering and limitation of activities, permanent injuries, medical expenses and consequential damages." Kantonides Answers to KLM Interrogatories, Response 39. She has enumerated claims for medical treatment totaling $1,311.86. Id., Response 25. A. Kantonides seeks damages for loss of the services, companionship, and consortium of T. Kantonides, as well as for her medical expenses. Id., Response 39.

The Complaint consists of three counts to recover damages for personal injury. Count One seeks compensation under the

---

**4.** T. Kantonides stated she sought treatment from three physicians, Kantonides Answers to KLM Interrogatories, Responses 18–23; however, no details about the medical treatment or prognosis were submitted.

Convention for the Unification of Certain Rules Relating to International Transportation by Air (the "Warsaw Convention"), 29 October 1934, 49 Stat. 3000, T.S. No. 876 (1934), *reprinted in* the note following 49 U.S.C.App. § 1502. Complaint, ¶¶ 4–7. Count Two seeks damages based on negligence. *Id.*, ¶¶ 8–10. Count Three seeks damages for loss of service, companionship and consortium. *Id.*, ¶¶ 11–12. The Kantonides also seek interest and costs of the suit. *Id.* In the Answer, KLM asserts numerous affirmative defenses, including inapplicability of the Warsaw Convention and absence of a duty or breach of duty under negligence. Answer, ¶¶ 9–10.

*Discussion*

KLM moves for summary judgment pursuant to Fed.R.Civ.P. 56 of the Complaint on the ground that no genuine issues of material fact exist. Moving Brief at 1. The Kantonides oppose the motion on the ground that genuine issues of material fact exist as to the application of the Warsaw Convention in this case and as to whether KLM breached its duty of care. Opp. Brief at 2.

A. Summary Judgment Standard of Review

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see also Desvi, Inv. v. Continental Ins. Co.*, 968 F.2d 307, 308 (3d Cir.1992) ("The threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" (citations omitted); *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir.1992) ("We apply the test ... (1) Is there no genuine issue of material fact and (2) is one party entitled to

judgment as a matter of law?") (quotations omitted); *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991) ("[S]ummary judgment is inappropriate when a conflict on a material fact is present in the record."); *Nathanson v. Medical College of Penn.*, 926 F.2d 1368, 1380 (3d Cir.1991) (Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed.").

All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Williams v. New Castle County*, 970 F.2d 1260, 1264 (3d Cir.1992); *Boyle v. Governor's Veterans Outreach & Assistance Center*, 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 797 (3d Cir.1990); *Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989). "'Any 'unexplained gaps' in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.'" *Ingersoll–Rand Fin. Corp. v. Anderson*, 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States*, 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining "'whether the evidence presents a sufficient disagree-

ment to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2512), *cert. denied*, — U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

The Supreme Court elaborated on the summary judgment standard in *Anderson v. Liberty Lobby:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted).

Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed.R.Civ.P. 56(e); *see also Gray*, 957 F.2d at 1078 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); *Carlson v. Arnot–Ogden Memorial Hosp.*, 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor"); *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Building Co.*, 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case").

### B. Warsaw Convention

KLM moves for summary judgment on Count One of the Complaint on the ground that the accident did not occur during the "course of any of the operations of embarking or disembarking" from an airplane, and that, therefore, this action is not covered by the Warsaw Convention. Moving Brief at 12; 49 U.S.C.App. § 1502, Art. 17. The Kantonides argue that the phrase "in the course of any of the operations of embarking and disembarking" from an airplane should be interpreted to include traveling through an airport to a connecting flight. Opp. Brief at 8.

The Warsaw Convention is intended to achieve uniformity in the area of air carrier liability. *Eastern Airlines, Inc. v. Floyd*, — U.S. ——, 111 S.Ct. 1489, 1502, 113 L.Ed.2d 569 (1991); *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 264, 104 S.Ct. 1776, 1789, 80 L.Ed.2d 273 (1984) (Stevens, J., dissenting); *Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152, 155 (3d Cir.1977). Although the Warsaw Convention does not preclude pleading alternative theories, when the Warsaw Convention applies, it is the exclusive remedy for actions against air carriers. *Onyeanusi v. PAN AM*, 952 F.2d 788, 793 (3d Cir.1992); *Abramson v. Japan Airlines Co.*, 739 F.2d 130, 134 (3d Cir.1984), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 *reh'g denied*, 471 U.S. 1112, 105 S.Ct. 2350, 85 L.Ed.2d 866 (1985).

The Warsaw Convention applies to all "international transportation of persons." 49 U.S.C.App. § 1502, Art. 1(1).[5] Once a

---

5. Article 1, subsection 2 provides, in pertinent part:

 For the purposes of this convention the expression "international transportation" shall

mean any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the trans-

plaintiff has established that she has contracted with an air carrier for international transportation, as provided in Article 3 of the Warsaw Convention, the plaintiff need only prove the elements of Article 17 to recover. Article 17 of the Warsaw Convention imposes liability on air carriers for personal injury regardless of fault on the part of the carrier. "In the Agreement Relating to Liability Limitations of the Hague Protocol and Warsaw Convention [(the "Montreal Agreement"), 13 May 1966], CAB Agreement 18900, *reprinted in* 49 U.S.C.App. § 1502 note (1988), the airlines agreed among themselves to change from a fault-based system to strict liability and to permit awards of up to $75,000." *Buonocore v. Trans World Airlines, Inc.*, 900 F.2d 8, 9 (2d Cir.1990); *Eastern*, ——— U.S. at ———, 111 S.Ct. at 1502. Article 17 of the Warsaw Convention states:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

49 U.S.C.App. § 1502, Art. 17.

KLM does not dispute that T. Kantonides was a passenger in "international transportation" within the meaning of Article 1.[6] KLM does not dispute that she was injured in an "accident" within the meaning of Article 17.[7] The determinative issue in this case is whether T. Kantonides was injured "in the course of the operations of embarking or disembarking" from an airplane. 49 U.S.C.App. § 1502, Art. 17.

### 1. Operations of Embarking

In *Evangelinos* the Third Circuit set forth the factors relevant to determining when a passenger was "in the course of the operations of embarking" an airplane. 550 F.2d at 155. *Evangelinos* involved an action by a family of passengers who were injured during a terrorist attack while waiting to board a flight. *Id.* at 153.

The facts were stated by the district court. *Evangelinos v. Trans World Airlines, Inc.*, 396 F.Supp. 95, 97 (W.D.Pa. 1975), *rev'd*, 550 F.2d 152 (3d Cir.1977). On the day of the attack, the plaintiffs went to the Athens Airport to take a Trans World Airlines ("TWA") flight to New York. 396 F.Supp. at 97. They arrived at the airport and proceeded to the departure hall where they checked their luggage and received boarding passes. *Id.* They proceeded to an area on the same level where their tickets were checked by police, and then they reported to passport and currency control. *Id.* The plaintiffs proceeded down a set of stairs into the Transit Lounge on the lower level. The entrance to the Transit Lounge was restricted to ticketed passengers scheduled to depart on international flights. Although forty carriers operated out of the terminal, the Transit Lounge was not partitioned according to airline. *Id.*

Once in the Transit Lounge, the plaintiffs went to the Transfer Desk to obtain seating assignments and then await the boarding announcement. *Id.* The Transfer Desk was staffed with TWA personnel as well as other air carrier employees. *Id.* The boarding announcement was made and

---

portation or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention.

49 U.S.C.App. § 1502, Art. 1(2).

**6.** KLM stated in the Moving Brief:

The passenger ticket issued to [T. Kantonides] provided for "international transportation" within the meaning of Article 1(2) of the Warsaw Convention. Both the place of origin

and the place of destination noted on [T. Kantonides'] ticket are in the United States (New York), a "Single High Contracting Party" to the [Warsaw] Convention, and there was "an agreed stopping place within a territory ... of another party," namely Amsterdam ... and ... Cyprus.

Moving Brief at 11.

**7.** The Court in *Air France* defined "accident" as "a passenger's injury [that] is caused by an unexpected or unusual event or happening that is external to the passenger." 470 U.S. 392, 405, 105 S.Ct. 1338, 1345, 84 L.Ed.2d 289 (1985).

the plaintiffs waited in line with the other passengers for a final search prior to passing through the gate. Although the searches were performed by the Greek Police, two TWA personnel and two TWA security guards were also stationed at the gate. *Id.*

If the searches had been completed, the plaintiffs would have passed through the exit doors of the Transit Lounge, descended two sets of stairs and entered a bus operated by Olympic Airlines that would have carried them to the airplane parked two hundred and fifty meters away. *Id.* However, when the terrorist attack occurred, only seven passengers had exited through the gate to board the bus. *Id.* at 98. At the time of the attack, all of the eighty-nine scheduled passengers had checked in and received boarding passes and most were standing in line at the gate for the final check. *Id.* The plaintiffs were injured while waiting in line in front of the gate. *Id.*

The *Evangelinos* court adopted the tripartite test established by *Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir. 1975), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976), *reh'g denied*, 429 U.S. 1124, 97 S.Ct. 1162, 51 L.Ed.2d 574 (1977), to determine when an accident occurs "in the course of any of the operations of embarking" an airplane as set forth by Article 17. *Evangelinos*, 550 F.2d at 155. The *Day* test, as adopted by *Evangelinos*, examines:

> [the] location of the accident, the activity in which the injured person was engaged, and the control by defendant of such injured person at the location and during the activity taking place at the time of the accident alleged to be "in the course of any of the operations of embarking".... [The court] place[d] less weight upon carrier control over passengers than did the *Day* court. While control remains at least equally as important as location and activity, it is an integral factor in evaluating both location and activity.

*Id.* The court held that the three factor test best effected the policies underlying

Article 17. *Id.* The court also noted that another possibly relevant factor is whether the accident is a hazard of air travel, as it exists at the time of the accident. *Id.* at 155, n. 8a; *see Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256, 1261 (9th Cir.), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977) (The primary goal of Warsaw Convention drafters was "to create a system of liability rules that would cover all the hazards of air travel.").

In concluding that the plaintiffs were injured during the "course of any of the operations of embarking," the court relied on certain facts. 550 F.2d at 155–56. First, it pointed out that the plaintiffs had "completed virtually all the activities required as a prerequisite of boarding, and were standing in line at the departure gate ready to proceed to the aircraft." *Id.* at 156. Second, the court noted that the flight had already been called for final boarding and "[a]s a result, TWA passengers were no longer mingling over a broad area with passengers of other airlines. Instead, acting pursuant to instructions, they were congregated in a specific geographical area designated by TWA and were identifiable as a group associated with" the flight to New York. *Id.*

The *Evangelinos* method of interpreting "embarking" governs the analysis of the Kantonides' accident. The determination of whether the Kantonides were "in the course of any of the operations of embarking," 49 U.S.C.App. § 1502, Art. 17, depends upon the location of the accident, what activity T. Kantonides was engaged in when she was injured and, to a lesser extent, the degree of control exercised by KLM.

T. Kantonides was injured approximately one-half hour before her flight was scheduled to depart. She was standing on a moving walkway in the common area of the terminal. There is no evidence that the Kantonides were led by KLM personnel onto the moving walkway. T. Kantonides was not standing in line waiting to board, she was still "two hundred to five hundred feet" from Gate C41. Kantonides Answers

to KLM Interrogatories, Responses 4, 9.. The Kantonides were also intermixed with passengers from other flights on other airlines. The passengers for the flight to Cyprus had not yet been congregated into a specific geographical area. And other than the unidentified KLM stewardess who witnessed the accident, there is no suggestion that KLM personnel were near the moving walkway, monitoring it or instructing passengers to use it.

The circumstances of the Kantonides' accident are distinct from the scenario presented in *Evangelinos*. The Kantonides lacked the proximity to the gate and the immediacy of boarding of the plaintiffs in *Evangelinos*. The Kantonides had not yet been segregated into an area supervised by KLM personnel. Resolving all inferences of fact in favor of the Kantonides, "embarking" under the Warsaw Convention does not extend to these facts.

### 2. *Operations of Disembarking*

Although *Evangelinos* specifically addressed only "the operations of embarking," 550 F.2d at 156, the three factors, location, activity and control, have also been considered in cases involving disembarking. *See Rabinowitz v. Scandinavian Airlines*, 741 F.Supp. 441 (S.D.N.Y.1990) (applying *Day* test to interpretation of embarking and disembarking); *Knoll v. Trans World Airlines, Inc.*, 610 F.Supp. 844 (D.Colo.1985) (applying tripartite test of plaintiff's location at time of accident, activity of plaintiff and control of airline to interpretation of disembarking); *Schmidkunz v. Scandinavian Airlines System*, 628 F.2d 1205 (9th Cir.1980) (applying assessment of total circumstances to interpretation of disembarking); *Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256 (9th Cir.) (applying assessment of total circumstances to interpretation of disembarking), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977); *Martinez Hernandez v. Air France*, 545 F.2d 279, 282 (1st Cir.1976), *cert. denied*, 430 U.S. 950, 97 S.Ct. 1592, 51 L.Ed.2d 800 (1977) (applying criteria of plaintiff's activity when injured, its location and the extent of control exercised by airline to interpreta-

tion of disembarking). *But see Mac-Donald v. Air Canada*, 439 F.2d 1402 (1st Cir.1971) (disembarking has terminated when passenger descended from plane by use of whatever mechanical means supplied and reached safe point inside terminal); *Felisima v. Trans World Airlines, Inc.*, 13 Av.Cas. (CCH) P 17,145 (S.D.N.Y.1974) (interpreting disembarking by reference to location of passenger at time of injury).

Two cases cited by KLM in the Moving Brief, *Rabinowitz* and *Schmidkunz*, closely parallel the facts of this case. In *Rabinowitz* the plaintiffs were unable to recover for any injury sustained while standing on a moving walkway. The plaintiffs were traveling from New York to Moscow on Scandinavian Airlines ("SAS"). 741 F.Supp. at 442. The flight included a short layover in Denmark, during which the plaintiffs were required to proceed from the arrival gate in Concourse C to the departure gate of their connecting SAS flight in Concourse B. While the plaintiffs were standing on a moving walkway, on route to Concourse B, one of the plaintiff's feet was caught and she was injured. *Id.* The injury occurred within five minutes of arrival and not more than seventy-five to one hundred feet from where they arrived. *Id.*

The *Rabinowitz* court applied the three factor *Day* test. Of importance to the court, were the facts that the plaintiffs had left the aircraft and the area of the arrival gate. *Id.* at 446. Although the plaintiffs were proceeding to a connecting flight, they were "proceeding at their own pace and under their own control" and were not due at the gate for one and one-half hours. *Id.* The plaintiffs were not led or accompanied by any SAS personnel. They were "free to go to a restroom, restaurant, bar or refreshment counter, to shop in the arcade, or to visit with other international passengers in the waiting lounges." *Id.*

The court did not find persuasive the fact that SAS personnel had directed the plaintiffs to use the moving walkway, the plaintiffs were held to be acting under their own control. *Id.* In addition the court specifically rejected the assertion that because

the plaintiffs had no interest in Denmark and contracted for a continuous trip, SAS's control and liability were continuous. *Id.* This was held to contravene the terms and purpose of Article 17 of the Warsaw Convention. *Id.*

The substance of the facts in *Schmidkunz*, 628 F.2d 1205, are identical to *Rabinowitz*, 741 F.Supp. 441. The plaintiff was injured on a moving walkway in the Denmark Airport while proceeding to a connecting SAS flight. *Schmidkunz*, 628 F.2d at 1206. The plaintiff had left the arriving airplane, was not closer than five hundred yards from the departing airplane's boarding gate and was still within the common passenger area of the terminal. *Id.* at 1207. She had not yet received her boarding pass, was not imminently preparing to board the plane and was not at that time under the direction of the carrier's personnel. *Id.* The court particularly noted the plaintiff's inability to identify who had advised her that the walkway was safe. The court noted that if the plaintiff had offered any evidence that the person was an SAS employee, it might have permitted the case to go to trial. However, the court affirmed the grant of summary judgment to SAS because the plaintiff was not "disembarking" within Article 17.

■ Although the Third Circuit has not had an opportunity to determine what factors should be considered in delineating what situations constitute "disembarking," it is appropriate to apply the factors described by the *Day* court. Once again the important factors include the location of the accident, the activity the Kantonides were engaged in at the time of the accident and the degree of control exercised by KLM.

Before the Kantonides deplaned in Amsterdam, KLM announced at what gate the connecting flights would depart. The Kantonides left the aircraft and proceeded toward their connecting flight. They left the arrival area and were standing on the moving walkway in the common area of the terminal when the accident occurred. T.

Kantonides was injured approximately one-half hour after leaving flight 644. At the time of the accident, the Kantonides were moving through the terminal, pursuant to the KLM announcement, but they were proceeding at their own pace and under their own control. Resolving all inferences of fact in favor of the Kantonides, the facts of the Kantonides accident do not fit within the term "disembarking" under the Warsaw Convention.

The Kantonides assert that the words of the Warsaw Convention must be interpreted in light of the modern advances and changes in technology and design. Changes in technology, however, do not impact the elements set forth in *Evangelinos* and *Day*. The circumstances of the Kantonides accident do not fall within the phrase "in the course of any of the operations of embarking or disembarking." Accordingly, KLM's motion for summary judgment is granted as to Count One.

### C. Negligence

KLM moves for summary judgment on Counts Two and Three of the Complaint on the ground that no genuine issues of material fact exist. KLM further argues that the Kantonides have not established the existence of elements essential to a claim of negligence. Moving Brief at 4.[8] The Kantonides argue that KLM, as a common carrier, owed them the utmost duty of care to provide them with a safe means of traveling from KLM flight 644 to KLM flight 537. Complaint, ¶ 9. The Kantonides assert that KLM breached this duty and that the breach was the direct and proximate cause of the injury. *Id.*, ¶ 10.

Under New Jersey law, "[n]egligence is tested by whether the reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others." *Matute v. Lloyd Bermuda Lines, Ltd.*, 931 F.2d 231, 237 (3d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 329, 116 L.Ed.2d 270 (1991); *GNOC Corp. v. Aboud*, 715 F.Supp. 644, 651 (D.N.J.1989) (quoting *Rappaport*

---

**8.** For the purposes of this motion, the parties agree that New Jersey law governs; Moving Brief at 6; Opp. Brief at 2–4, however, there has been no ruling that New Jersey law applies.

*v. Nichols,* 31 N.J. 188, 201, 156 A.2d 1 (1989). The threshold inquiry, for an action in negligence is whether, as a matter of law, the defendant owed the plaintiff a duty of care. *GNOC,* 715 F.Supp. at 651; *Huddell v. Levin,* 537 F.2d 726, 734 (3d Cir.1976); *Morie Energy Management, Inc. v. Badame,* 241 N.J.Super. 572, 576, 575 A.2d 885 (App.Div.1990); *Strachan v. John F. Kennedy Memorial Hosp.,* 109 N.J. 523, 529, 538 A.2d 346 (1988); *Swidryk v. St. Michael's Med. Ctr.,* 201 N.J.Super. 601, 606, 493 A.2d 641 (Law Div.1985).

Whether the defendant owed the injured party a duty of care is a question of fairness and requires weighing "the relationship of the parties, the nature of the risk and the public interest in the proposed solution." *Wang v. Allstate Ins. Co.,* 125 N.J. 2, 15, 592 A.2d 527 (1991); *Morie,* 241 N.J.Super. at 576; *Swidryk,* 201 N.J.Super. at 606, 493 A.2d 641. The question of whether a duty exists is a question of law properly decided by the court. *GNOC,* 715 F.Supp. at 652; *Wang,* 125 N.J. at 15, 592 A.2d 527; *Strachan,* 109 N.J. at 529, 538 A.2d 346.

 For a defendant to be liable, it must have breached a duty of care, which duty, if observed, would have averted the plaintiff's injuries. *Fortugno Realty Co. v. Schiavone-Bonomo Corp.,* 39 N.J. 382, 393, 189 A.2d 7 (1963) *overruled on other grounds by Gilborges v. Wallace,* 78 N.J. 342, 396 A.2d 338 (1978); *Crispino v. U.S.,* 135 F.Supp. 587, 589 (D.N.J.1955); *Brody v. Albert Lifson & Sons, Inc.,* 17 N.J. 383, 389, 111 A.2d 504 (1955); *Mazzilli v. Selger,* 13 N.J. 296, 301, 99 A.2d 417 (1953). The standard of care in analyzing negligence cases is ordinarily what a prudent person would have foreseen and done under similar circumstances. *GNOC,* 715 F.Supp. at 651-52; *Weinberg v. Dinger,* 106 N.J. 469, 484, 524 A.2d 366 (1987); *People Express Airlines, Inc. v. Consolidated Rail Corp.,* 100 N.J. 246, 262, 495 A.2d 107 (1985). However, when the defendant is a common carrier, a heightened standard is applicable:

> Carriers wh[ich] accept passengers entrusted to their care must use great caution to protect them, which has been described as the 'utmost caution characteristic of very careful prudent men,' or 'the highest possible care consistent with the nature of the undertaking,' and this may include the relational duty to exercise control of the conduct of third persons.

*Ricci v. American Airlines,* 226 N.J.Super. 377, 381, 544 A.2d 428 (App.Div.1988), *cert. denied,* 113 N.J. 639, 552 A.2d 165 (1988) (citation omitted). A carrier must exercise a high degree of care for the safety of its passengers so as to avoid the dangers that are known or reasonably anticipated. *Id.* at 382, 544 A.2d 428 (citing *Harpell v. Public Service Coordinated Transport,* 20 N.J. 309, 317, 120 A.2d 43 (1956).

The New Jersey courts have not decided any cases bearing directly on the issue of an airline's duty to its passengers, once the passengers have left the aircraft and are in the common areas of the airport. "When a federal court is faced with a question of state law that has not been interpreted, it must 'predict how the New Jersey Supreme Court would rule if presented with this case.'" *McWilliams v. Yamaha Motor Corp.,* 780 F.Supp. 251, 256 (D.N.J.1991) (quoting *Repola v. Mobark Indus., Inc.,* 934 F.2d 483, 489 (3d Cir.1991)), *appeal docketed,* No. 91-6024 (3d Cir. 13 Dec. 1991). "'In predicting how the highest state court would decide an issue, the federal court may look to analogous state court cases, treatises, restatements and law review articles.'" *McWilliams,* 780 F.Supp. at 256 (quoting *National-Standard Co. v. Clifton Ave. Corp.,* 775 F.Supp. 151, 157-58 (D.N.J.1991)).

Analogous cases from the New Jersey state courts involve railroads and shopkeepers. In *Buchner v. Erie RR. Co.,* 17 N.J. 283, 111 A.2d 257 (1955), the court held a railroad liable for failing to maintain a curb less than two feet beyond its property line upon which a departing passenger fell. The railroad did not own, construct or maintain the curb. Nonetheless, the court held that the carrier had a duty to maintain a reasonably "safe means of ingress and egress" for the use its passengers and had breached that duty. *Id.* at 286, 111 A.2d 257.

In *Horelick v. Pennsylvania R. Co.,* 24 N.J.Super. 413, 94 A.2d 685 (App.Div.),

**1214**

*aff'd*, 13 N.J. 349, 99 A.2d 652 (1953), the court held a railroad liable for negligently maintaining a station platform. The plaintiff slipped on a piece of ice obscured by dirt as she exited the platform located next to the train. The court stated:

> The duty of a carrier obtains not only while the passenger is in travel, but while they sustain the relationship of passengers or prospective or intended passengers and are performing acts reasonably and fairly attributable to that relationship.... To hold that by reason of a contractual arrangement between a carrier and a terminal company a carrier may be absolved of this duty to its passengers, is to constitute a distinction of duty without a difference of relationship for which we find no justification in our law.

*Horelick*, 24 N.J.Super. at 419, 94 A.2d 685 (citations omitted).

Numerous New Jersey state cases have held a commercial tenant, who is in exclusive possession of certain premises abutting a sidewalk, liable when pedestrians were injured due to the tenant's negligent maintenance of the sidewalk. *Antenucci v. Mr. Nick's Mens Sportswear*, 212 N.J.Super. 124, 130, 514 A.2d 75 (App.Div. 1986) (window shopper caught shoe in sidewalk); *Warrington v. Bird*, 204 N.J.Super. 611, 616–17, 499 A.2d 1026 (App.Div.1985) (diner hit by car crossing street between restaurant and restaurant's parking lot) *cert. denied* 103 N.J. 473, 511 A.2d 653 (1986); *Merkel v. Safeway Stores, Inc.*, 77 N.J.Super. 535, 540, 187 A.2d 52 (Law Div. 1962) (customer fell on ice on sidewalk between store and store's parking lot). These cases reject, as a defense, the lack of control by the tenant over the land in question. The *Warrington* court stated:

> We agree that the critical element should not be the question of the proprietor's control of the area to be traversed, but rather the expectation of the invitee that safe passage will be afforded from the parking facility to the establishment to which they are invited.

204 N.J.Super. at 617, 499 A.2d 1026. This line of cases, however, deals only with tenants in exclusive control of the premises.

Recently, in *Barrows v. Trustees of Princeton Univ.*, 244 N.J.Super. 144, 581 A.2d 913 (Law Div.1990), a trial court refused to extend the duty of a tenant-proprietor in a multi-tenant property to areas not controlled or occupied by the tenant. The *Barrows* court declined to find the tenants of a shopping mall liable to a mall customer who fell on ice on an exterior sidewalk. The court stated:

> Because tenants in a multi-tenant shopping mall will not, absent a contractual obligation, have control or maintenance responsibilities for common walkways or sidewalks, this court concludes that the duties imposed by ... *Antenucci* do not extend to tenants in multi-tenant shopping complexes.

244 N.J.Super. at 148, 581 A.2d 913. The court granted summary judgment to all the defendant shopkeepers except one. Summary judgment was denied with regard to one shopkeeper because a common law negligence claim might be valid. He was in control of the awning that caused the ice to develop and should have been aware of the developing danger. *Id.* at 148–49, 581 A.2d 913.

Other state courts have dealt with cases factually similar to the case at bar. The majority have refused to hold that the air carrier owed its passengers a duty when the passenger was injured in a common area of the airport. These cases include *Warshavesky v. El Al Airlines*, 10 Av.Cas. (CCH) 18,315 (N.Y.Sup.Ct.1969) (no duty for slip on staircase despite announcement to use stairs because defendant neither owned, occupied or controlled the area including stairs and no constructive notice of defective condition); *Marshall v. United Airlines*, 35 Cal.App.3d 84, 110 Cal.Rptr. 416 (1st Dist.1973) (no duty for fall due to step in disrepair far from arrival gate despite common carrier's higher duty of care because standard relaxed to reasonableness when passenger entered terminal and because defendant did not lease, own, maintain or control the location of the accident); *Air Canada v. Smith*, 357 So.2d 789 (Fla.Dist.Ct.App.1978) (no duty for fall in baggage claim area despite fact plaintiff was proceeding to connecting flight; defen-

dant did not own, maintain or control area where accident occurred and had no duty to look for possible perils on premises exclusively possessed, maintained and controlled by another entity); *Powell v. Delta Air Lines, Inc.*, 16 Av.Cas. (CCH) 17,741 (N.Y.Civ.Ct.1981) (no duty for fall on escalator ascending from defendant's terminal to main concourse of airport because defendant was one of a number of tenants in building and did not own, operate, maintain or control escalator).

The decisions of other state courts are not uniform and air carriers have been found to owe passengers a duty in central terminal areas. In *Knoxville v. Bailey*, 222 F.2d 520 (6th Cir.1955), the court found defendant Delta Air Lines ("Delta") liable for injury sustained when one of its passengers waiting for a flight fell while attempting to descend steps just outside the terminal entrance.

Delta leased space within the terminal, but did not own, maintain or control the area of the accident. Upon finding no binding Arizona case law, the court held:

> Without undertaking to review the [other state] cases, we think the best considered rule is that a common carrier should not be relieved from liability for injury to its passengers, resulting in unsafe condition of the station premises which they must use in order to board its trains or airplanes, by reason of the mere fact that such premises are under control of another company or a municipality with which the carrier has contracted for terminal facilities.

222 F.2d at 527. In *Bailey*, there was evidence that other people had been injured in this location and defendant had refused and neglected to place warning signs or install handrails. The jury verdict in favor of plaintiff was sustained. *See also, Crowell v. Eastern Air Lines, Inc.*, 81 S.E.2d 178, 187 (D.N.C.1954) (due to defects in threshold, passenger fell exiting waiting room of airport; Eastern liable because previous accidents provided notice of defect).

■ Under New Jersey law a common carrier, such as KLM, owes its passengers a duty to provide a reasonably safe means of ingress and egress. *Buchner*, 17 N.J. at 286, 111 A.2d 257; *Horelick*, 24 N.J.Super. at 419, 94 A.2d 685. This duty extends to areas not owned or controlled by the carrier, *Buchner*, 17 N.J. at 285, 111 A.2d 257, and continues while the relationship of carrier and passenger exists. *Horelick*, 24 N.J.Super. at 419, 94 A.2d 685. The duty cannot be avoided through a lease arrangement with the terminal. *Id.*

In this case, KLM owed the Kantonides a duty to provide a reasonably safe means of ingress or egress. However, that duty did not and does not encompass the common areas of the airport terminal. The present case involves a moving walkway a couple hundred feet from either of the KLM gates at issue. The proximity of the walkway is not comparable to a curb less than two feet from the defendant's property as in *Buchner* or to a platform adjacent to a train as in *Horelick*. It is impracticable to extend KLM's duty to provide safe ingress and egress to include the moving walkway. If KLM were found to owe passengers a duty of care with regard to distant premises that it does not own, lease, control or maintain, there would be no logical end to that duty. The Kantonides' argument that KLM owed them a duty the entire time they were traveling, because KLM required them to transfer airplanes in Amsterdam, is rejected. Kantonides Answers to KLM Interrogatories, Responses 7, 10.

■ Commercial tenants in exclusive possession of premises owe customers a duty to maintain an abutting property they neither own, lease, maintain nor control. *Antenucci*, 212 N.J.Super. at 130, 514 A.2d 75; *Warrington*, 204 N.J.Super. at 616–17, 499 A.2d 1026; *Merkel*, 77 N.J.Super. at 540, 187 A.2d 52. However, commercial tenants in multi-tenant facilities do not owe customers a duty of care with regard to common areas not owned, leased, maintained or controlled by them. *Barrows*, 244 N.J.Super. at 148–49, 581 A.2d 913.

KLM is a commercial tenant and does not "exclusively possess" the common area of Schiphol Airport where the moving walkway is located. Dekker Aff. ¶ 5; KLM 12G ¶ 5. KLM does not own, lease, maintain or control the area of the terminal where the moving walkway is located. Dekker Aff.

**1216**

¶¶ 6–7. Unlike the defendant in *Barrows* who was not granted summary judgment because it controlled the awning that caused the ice formation, KLM did not control the moving walkway that caused T. Kantonides' injury. There is no basis under New Jersey negligence law to impose a duty of care on KLM for the accident occurring on the moving walkway in the common area of Schiphol Airport.

This holding is in accord with the decisions of other states refusing to impose a duty of care on air carriers for maintenance of areas beyond their control. *Warshavesky*, 10 Av.Cas. (CCH) 18,315; *Marshall*, 35 Cal.App.3d 84, 110 Cal.Rptr. 416; *Air Canada*, 357 So.2d 789; *Powell*, 16 Av.Cas. (CCH) 17,741. It is also in accord with the cases where air carriers were held to owe passengers a duty of care for these areas. *Bailey*, 222 F.2d 520; *Crowell*, 81 S.E.2d 178, 187. Unlike *Bailey* and *Crowell*, there is no suggestion that similar accidents had previously occurred so as to put KLM on notice.

Maintenance of the moving walkways was attended to by the Airport Authority. The Airport Authority stated that the moving walkways are,

> systematically checked, every six weeks, on their operation.... [and] there is an annual inspection by the Dutch Lift (elevator) Institute required by the government....
>
> These facilities are on government's instructions equipped with a stop button and provided on two sides with handrails so as to enable users to hold [on], which of course is of particular importance in case of an emergency stop.

Opp. Brief, Ex. C. Accepting as true the Kantonides' statement that the moving walkway "malfunctioned" or, in the alternative, the assertion that the emergency stop button was pressed, Opp. Brief at 4, there is no indication that KLM breached any duty which, if observed, would have averted the accident. *Fortugno*, 39 N.J. at 393, 189 A.2d 7; *Crispino*, 135 F.Supp. at 589; *Brody*, 17 N.J. at 389, 111 A.2d 504; *Mazzilli*, 13 N.J. at 301, 99 A.2d 417.

Requiring an air carrier to be liable for injuries to passengers occurring beyond the areas within their control or their ability to regulate would violate principles of foreseeability and fairness. *Wang*, 125 N.J. at 15, 592 A.2d 527; *Strachan*, 109 N.J. at 529, 538 A.2d 346. In addition, the attendant risks associated with a moving walkway are not sufficient to warrant imposing a duty of care for their operation on air carriers. *Morie*, 241 N.J.Super. at 577, 575 A.2d 885; *Swidryk*, 201 N.J.Super. at 606, 493 A.2d 641.

As a matter of law KLM did not owe the Kantonides a duty of care at the time of the accident; therefore, the Kantonides are unable to meet the threshold inquiry into negligence. Summary judgment is granted with respect to Counts Two and Three.

*Conclusion*

For the reasons set forth above, the motion for summary judgment is granted with respect to all counts in the Complaint.